**PERSIAN GULF OUTWARD FREIGHT CONFERENCE, Petitioner,**

v.

**FEDERAL MARITIME COMMISSION**
and United States of America,
Respondents,

Dampskibsaktieselskabet Alaska, et al.,
Constellation Line, et al.,
Intervenors.

**No. 19322.**

United States Court of Appeals
District of Columbia Circuit.

Argued Nov. 4, 1965.

Decided March 8, 1966.

---

7. Judge Washington's opinion in Coleman v. United States. 115 U.S.App.D.C. 191, 195, 317 F.2d 891, 895, involved only a misdemeanor.

Mr. Elmer C. Maddy, New York City, with whom Mr. Ronald A. Capone, Washington, D. C., was on the brief, for petitioner.

Mr. Walter H. Mayo, III, Atty., Federal Maritime Commission, of the bar of the Supreme Judicial Court of Massachusetts, pro hac vice, by special leave of court, with whom Asst. Atty. Gen. Donald F. Turner, Messrs. M. C. Miskovsky, Sol., Federal Maritime Commission, and Irwin A. Seibel, Atty., Dept. of Justice, were on the brief, for respondents. Mr. John C. Hunt, Atty., Federal Maritime Commission, also entered an appearance for respondent Federal Maritime Commission.

Mr. Marvin J. Coles, Washington, D. C., with whom Messrs. Donald D. Webster, Armin U. Kuder and Stanley O. Sher, Washington, D. C., were on the brief, for intervenors, Constellation Line, "Hansa" Line, Hellenic Line, Ltd., and N. V. Nedlloyd Lijnen.

Messrs. Sanford C. Miller, New York City, and Donald D. Webster, Washington, D. C., were on the brief for intervenor "Concordia" Line.

Before FAHY, DANAHER and TAMM, Circuit Judges.

FAHY, Circuit Judge:

Persian Gulf Outward Freight Conference petitions this court to vacate as contrary to Section 15 of the Shipping Act, 1916, as amended,[1] the Commission's Order of April 14, 1965, approving Conference Agreement No. 8900, and to remand the Agreement to the Commission for disapproval. The Agreement created a second conference of shipping lines engaged in trade between Atlantic and Gulf ports of the United States and ports in the Persian Gulf and waters adjacent thereto in the range west of Kurachi and northeast of Aden. The carriers in the Agreement do not fly the American Flag, as do the two shipping lines which compose the petitioner Conference. At an earlier period all carriers in both groups, with one exception, composed a single conference. Later an independent entered the same area and transported large quantities of automobiles at rates below those then charged by the carriers in the petitioner Conference. Since petitioner would not reduce its rates to meet this competition the carriers now in Agreement No. 8900 withdrew. After a severe rate war, and in the effort to gain rate stability, they formed this new Conference with the independent carrier.

The principal question is whether the Commission may validly approve a second rate-making agreement "in the same trade" which the older Conference says it serves. It contends that earlier Commission approval of its agreement precludes approval of another conference among carriers engaged in transportation from and to the ports aforesaid. The Act itself does not in express terms support this contention. Section 15, set forth in pertinent part in the margin,[2]

[1]. 46 U.S.C. § 814.

[2]. 46 U.S.C. § 814. * * *
   The Commission shall by order, after notice and hearing, disapprove, cancel or modify any agreement, or any modification or cancellation thereof, whether or not previously approved by it, that it finds to be unjustly discriminatory or unfair as between carriers, shippers, exporters, importers, or ports, or between exporters from the United States and their foreign competitors, or to operate to the detriment of the commerce of the United States, or to be contrary to the public interest, or to be in violation of this chapter, and shall approve all other agreements, modifications or cancellations. No such agreement shall be approved, nor shall continued approval be permitted for any agreement (1) between carriers not members of the same conference or conferences of carriers serving different trades that would otherwise be naturally competitive, unless in the case of agreements between carriers, each carrier, or in the case of agreements between conferences, each conference, retains the right of in-

provides that the Commission shall approve all agreements between carriers except as therein set forth. Though there is no express provision that only one agreement between carriers transporting from and to ports in the same or similar location shall be approved petitioner urges that the legislative history of Section 15 and other facets of the Act demonstrate that Congress so intended. Illustrative is H.R.Doc.No. 805, 63d Cong., 2d Sess. 416 (1915), known as the Alexander Report. It is there said that the advantages sought,

> can be secured only by permitting the several lines in any given trade to cooperate through some form of rate and pooling arrangement under Government supervision and control.

Other language relied upon it found in S.Rep.No. 2494, 81st Cong., 2d Sess. (1949), where conference agreements are referred to as agreements "between the American and foreign operators engaged in each particular service." These and perhaps other references do seem to indicate that those engaged in the formulation of the Act contemplated that ordinarily carriers in a particular trade would form one conference.[3] Special consideration seems not to have been given to the particular problem with which we are concerned; but it seems equally clear that the right of the Commission to approve more than one conference in circumstances like those now before us was not prohibited. In this situation for the court to prohibit it would do what Congress should do if it is to be done at all. The language of the Act itself is broad enough to authorize more than one conference in the circumstances. Therefore we should not narrow the Commission's authority by a doubtful construction which would preclude the

exercise of its discretion, governed by those limitations which are clearly expressed in the Act. The Commission itself in Oranje Line et al. v. Anchor Line Limited et al., 5 FMB 714, 731, though for reasons there stated it did not approve a second conference, said the contention that it could not do so "is not supported by the language of the Act nor by its legislative history."

■ Petitioner also challenges what it terms the Commission's justification for approving the agreement, namely, that there is substantially no present or foreseeable competitive relation between the conferences in regard to either ports served, cargoes carried, rates charged, or service to shippers. The Commission found that since conflicting competitive conditions were lacking the basic premises upon which its Examiner recommended disapproval of the Agreement disappeared. The basic Commission decision contains a rather detailed statistical analysis of relevant factors. This shows that of the ports served by carriers in petitioner Conference and those in the new Conference the overlap was at 6 out of 21 ports during the period tested, with "substantial differences in the number of calls and service" at the six ports. The analysis of cargo carried, rates charged, and service to shippers supports the conclusion reached that "there is substantially no present or foreseeable competitive relation between the parties." This decision does not find an absence of all competitive relation but gives several reasons for the conclusion that the competition was not sufficient to prevent approval of the Agreement. One of the reasons given for approval is that the Agreement would assist in achieving the objective of enabling United States merchants to compete better with foreign

---

dependent action, or (2) in respect to any conference agreement, which fails to provide reasonable and equal terms and conditions for admission and readmission to conference membership of other qualified carriers in the trade, or fails to provide that any member may withdraw from membership upon reasonable notice without penalty for such withdrawal.

3. See, also, *Hearings before the House Committee on Merchant Marine and Fisheries* on H.R. 14337, 64th Cong., 1st Sess. 122 (1916); *Report on the Ocean Freight Industry*, H.R.Rep. 1419, 87th Cong., 2d Sess. (1962); H.R.Rep. No. 498, 87th Cong., 1st Sess. 4 (1961).

shippers in the Persian Gulf area, particularly in carrying automobiles and bagged flour. With other factors this was thought to outweigh any conceivable detriment to the commerce of the United States. The carriers of petitioner are charging higher rates than the carriers seeking approval of the new Agreement. This is because the former predominantly carry government cargo required, to the extent they are available, to be shipped on commercial vessels flying the United States flag,[4] and Defense Department cargo, all of which must be carried on U. S. flag ships.[5] American exporters to the area find these rates unattractive compared with those offered by the carriers in Agreement No. 8900, which are not likely to adopt the higher rates. In view of this situation the decision states:

> We would not foreclose opportunities to independents to form what might well prove to be an effective conference and by such foreclosure prompt them (even if such prompting were possible) to join the present highrate Conference; thereby insuring its existence, thereby having only high rates available to commercial exporters from the United States, and thereby reducing the opportunities for United States exporters to participate in the trade in competition with foreign competing shippers who possibly might have lower rates available to them.

> \*   \*   \*   \*   \*

> The record shows further that if rate wars and instability are a factor they will be diminished by approval because all the incentives to reduce rates opportunistically exist between the applicant carriers rather than between applicants and protestants. There is a potentially destructive competitive relationship among the independent applicant carriers which compete in regard to rates and serve many ports in common.

The analysis of the competitive situation referred to finds adequate support in the evidence and furnishes basis for the decision contrary to that of the Examiner.

The details to which we have referred are from the joint decision of two Commissioners, the Vice Chairman and Commissioner Patterson. In a concurring opinion the Chairman points out that the filing of the Agreement was the culmination of a bitter rate war which commenced with the entry into the trade of a strong independent line, followed by the partial breakup of petitioner Conference because some of its members needed greater flexibility to combat the independent competition. The breakup ended in an all out fight for the available cargo between the independent lines, with a rapid deterioration of rates. He agreed that at present the Conference and the independents did not compete for the same cargoes, the Conference being substantially limited to Government cargo while the independents carried commercial cargo. He stated that approval would serve the immediate needs of the trade. He added that if conditions later warranted, the Commission could reexamine the situation to determine whether continued approval was justified.

Petitioner contends that approval was an abuse of the Commission's discretion because not based on its own judgment but on the unjustified assumption that it was the will of Congress that the Agreement be approved. Petitioner has in mind a report of the Joint Economic Committee of Congress, commonly known as the Douglas Report, released December 28, 1964 (S.Rep.No. 1, 89th Cong., 1st Sess. [1965]). The Examiner's initial decision recommending disapproval was handed down March 10, 1964, followed by oral argument before the Commission May 27, 1964, with the final report and order delayed until April 14, 1965. This was about four months after the Committee Report was released December 28, 1964. Petitioner draws the inference that the Commission delayed its decision to await the Report. It says

---

4. 46 U.S.C. § 1241(b).

5. 10 U.S.C. § 2631.

the usual time lag between oral argument and final decision approximates the delay which occurred between release of the Committee Report and the issuance of the decision. Though we were to join petitioner in this inference nevertheless the content of the Report, a public document, does not supply a basis for holding that the decision was not the result of the independent judgment of the Commission. Petitioner's reliance for a contrary view is primarily the following statement at p. 38 of the Report.

There are three American-flag conference lines serving the Persian Gulf. More than 60 percent of the Stevenson Lines' cargo to the Persian Gulf is Government sponsored, and more than 80 percent of Isthmian Lines and Central Gulf Steamship Corp. cargoes are Government sponsored. This is conclusive proof that cargo preference laws tend to raise freight rates. It also proves that regular commercial rates are increased as the result of cargo preference laws, and *if they are not checked by a conference breakup* may destroy commercial exports of the United States to a particular trade area. (Emphasis supplied.)

The breakup in the conference, however, occurred several years before this statement appeared; and the question before the Commission was whether those which had broken away could form with another carrier a new conference with Commission approval. As to this the Report is silent.

Petitioner places reliance upon the circumstance that the Report states that the Commission's Hearing Counsel had stated that the record shows there was no competition between the Conference lines and the non-Conference lines for the carriage of commercial cargo and that the American lines had abandoned the commercial field. The Hearing Counsel is also quoted in the Report to the effect that shipments of commercial cargo carried to the Persian Gulf competed with exporters from foreign ports and caused one to wonder how an American shipper of commercial cargo could compete with its foreign competitors if he ships on Conference carriers and is charged Conference rates; that commercial cargo is moving in the trade primarily as a result of the low rates prevailing in the tariffs of the non-Conference lines and that the Conference lines stopped being competitive for commercial cargo and yet have increased their yearly sailings. From the fact that the Examiner had found that the Conference Lines did compete for commercial cargo in the trade, a finding with which the Commission disagrees, petitioner would have the court infer that the reference in the Report to the Commission's Hearing Counsel's statements led the Commission to adopt the views he held. But the recitation in the Report of these views is not a sufficient basis for the court to conclude that the findings with respect to the competitive situation should be laid to the Committee of Congress rather than to the Commission's own conclusion that its Hearing Counsel's position was supported by the factual analysis made in the decision. We find no interference by the Committee with the decisional responsibility of the Commission which would justify the court in concluding that the decision was reached upon grounds other than those given for it.

▪ Another contention of petitioner is that since only two of the five Commissioners joined in the detailed decision, the Chairman concurring in a separate opinion, one Commissioner dissenting and one not participating, the decision of the Examiner was entitled to greater weight than it was accorded. In the same connection it is suggested, with a reference to Interstate Commerce Commission v. New York, N. H. and H. R. Co., 372 U.S. 744, 751, 83 S.Ct. 1038, 10 L.Ed.2d 108, that no rationale of the decision gained the support of a majority of the Commissioners, and, therefore, the decision cannot be sustained.

We agree that the situation required that serious consideration be given to the Examiner's decision; but we cannot say this did not occur. His decision was not ignored as petitioner contends. The

three Commissioners who approved the Agreement explicitly referred to the Examiner's disapproval and gave their reasons for a different conclusion. Perhaps it comes down to a need for the court itself more carefully than ordinarily to consider the Examiner's views, where the Commission is as divided as here. Even so, we are unwilling to substitute our judgment for that of the Commission in approving the Agreement. We bear in mind the Chairman's statement in his concurring opinion:

At present, the conference and the independents do not compete for the same cargoes. As noted, the conference, since they were priced out of the general cargo market by the rate war, are substantially limited to government cargo; the independents carry commercial cargo. So long as the conference is unable or unwilling to meet the prevailing independent rates, no conflict will exist between the two groups. Thus, the *Oranje* decision is distinguished. At the same time, the competitive relationship between the independents, upon approval of this agreement, will be ameliorated. Currently, our approval of Agreement No. 8900 will serve the immediate needs of the trade. Later on, if conditions warrant, we may reexamine the practical justification for continued approval of the agreement.

Finally, as to the suggestion the decision cannot be sustained for lack of concurrence by a majority of the Commissioners in a rationale of decision, we think there was such concurrence. The separate opinion of the Chairman does not depart from the views expressed by Vice Chairman Day and Commissioner Patterson. We construe the Chairman's concurrence as just that. His suggestion that conditions later might warrant reexamination does not detract from the effectiveness of his present approval.

Affirmed.