**PERSIAN GULF OUTWARD FREIGHT
CONFERENCE, Petitioner,**

v.

**FEDERAL MARITIME COMMISSION**
and
**United States of America,
Respondents.**

No. 20350.

United States Court of Appeals
District of Columbia Circuit.

Argued Jan. 6, 1967.

Decided Feb. 28, 1967.

Mr. Elmer C. Maddy, New York City, with whom Mr. Ronald A. Capone, Washington, D. C., was on the brief, for petitioner. Mr. Jerome K. Tankel, Washington, D. C., also entered an appearance for petitioner.

Mr. Joseph F. Kelly, Jr., Atty., Federal Maritime Commission, of the bar of the Supreme Court of New Jersey, pro hac vice, by special leave of court, with whom Asst. Atty. Gen., Donald F. Turner, Messrs. James L. Pimper, Gen. Counsel, Robert N. Katz, Sol., Federal Maritime Commission, and Irwin A. Seibel and Richard A. Wegman, Attys., Dept. of Justice, were on the brief, for respondents. Mr. Walter H. Mayo, III, Atty., Federal Maritime Commission, also entered an appearance for respondent Federal Maritime Commission.

Before EDGERTON, Senior Circuit Judge, TAMM and ROBINSON, Circuit Judges.

TAMM, Circuit Judge:

This case comes before this court on petition to review a final order of the Federal Maritime Commission issued and served on July 22, 1966, pursuant to the Shipping Act of 1916, c. 451, 39 Stat. 728, as amended, 46 U.S.C. § 801 et seq.[1] The present controversy arises as an outgrowth of activities which were previously considered by this court in Persian Gulf Outward Freight Conference v. Federal Maritime Commission, 124 U.S.App.D.C. 63, 361 F.2d 80 (1966). In that case we affirmed the Commission's order of approval of rate making agreement No. 8900, establishing a second rate making conference in the same trade in which the present petitioner competes. Prior to the establishment of the "8900" conference, the only conference in that trade was composed of both American flag and foreign flag ships engaged in trade between Atlantic and Gulf ports of the United States and ports in the Persian Gulf and waters adjacent thereto. Its authority to set rates derived from Agreement No. 7700, approved May 28, 1946. However, in 1959, the foreign flag carriers withdrew from the conference and sought approval for their own rate making agreement (No. 8900). The defection of the foreign flag carriers came about because:

> "an independent entered the same area and transported large quantities of automobiles at rates below those then charged by the carriers in the petitioner Conference. Since petitioner would not reduce its rates to meet this competition the carriers now in Agreement No. 8900 withdrew. After a severe rate war, and in the effort to gain rate stability, they formed this new Conference with the independent carrier." *Id.* at 81.

I.

In an effort to meet the competitive threat posed by the new conference, the petitioner conference filed with the Commission a revision of its tariff providing two rates on some 500 items, one rate to apply if the cargo were carried on American flag vessels, and a second, lower rate if the cargo were carried on foreign flag vessels. The two American steamship lines which make up the 7700 conference have chartered some foreign flag vessels to carry at the foreign flag rate and have also, in one case, transferred owned for-

---

1. The order was issued in the Commission's Docket No. 66–27, *The Persian Gulf Outward Freight Conference (Agreement No. 7700)—Establishment of a Rate Structure Providing for Higher Rate Levels for Service via American-Flag Vessels versus Foreign-Flag Vessels.*

eign flag vessels from other trades to the Persian Gulf trade. As noted, petitioner filed its dual rate proposal as a revision of its tariff and not as an agreement or modification of an agreement subject to Commission approval pursuant to the requirements of Section 15 of the Shipping Act.[2]

Subsequent to the filing of the tariff revisions, an order to show cause issued from the Commission to petitioner, directing it to show why the tariff "revisions" should not be declared unlawful and ordered stricken from the tariff. In the order to show cause the Commission stated that "this proceeding shall be limited to the submission of memoranda of law [and] oral argument."

The petitioner conference submitted a memorandum of law but protested that the Commission was not authorized to take action in this matter until it had held a full evidentiary hearing under Sections 15, 22 and 23 of the Shipping Act, as amended, 46 U.S.C. §§ 814, 821, and 822; Sections 5 and 7 of the Administrative Procedure Act, 5 U.S.C. §§ 1004, 1006; and the Commission's own Rules of Practice and Procedure, 46 C.F.R. § 502.142. Additionally, the conference pointed out that it had filed its rates pursuant to its approved Section 15 Agreement (No. 7700), which stated in Article 1:

"This agreement covers the establishment and maintenance of agreed rates, charges and practices for or in connection with transportation of cargo by members of this Conference."

It further pointed out that a full evidentiary hearing would show that the rates set by the tariff revision were nothing new, having been used in this trade and an adjacent one as well as in the North Atlantic trade before the war. Counsel for the Commission filed a memorandum of law in opposition to that of petitioner, and an oral argument was held before the full Commission.

By a report and order of July 22, 1966, the Commission found that the rates contained in the conference's challenged tariff were not authorized by the conference agreement, ordered the conference to cease and desist from carrying cargo at such rates prior to approval of the rate structure under Section 15, and further ordered that the rates in question should be stricken from the conference's tariff.

## II.

Petitioner attacks the decision of the Maritime Commission on several bases: It challenges the power of the Commission to issue a cease and desist order without granting the petitioner a full evidentiary hearing on the factual issues it has raised and alleges that the Commission has violated the provisions of the Shipping Act, the Administrative Procedure Act, and its own rules by failing to accord petitioner such an evidentiary hearing. Petitioner argues that Section 15 specifically states that it is inapplicable to tariff rates agreed upon by approved conferences, and contends that the Commission's decision is in error that the rates set by the conference here were in violation of Section 15.

2. Section 15 provides in relevant part:
"[That] Every common carrier by water, or other person subject to this Act, shall file immediately with the Commission a true copy, or, if oral, a true and complete memorandum, of every agreement with another such carrier or other person subject to this Act, or modification or cancellation thereof, to which it may be a party or conform in whole or in part, fixing or regulating transportation rates or fares; giving or receiving special rates, accommodations, or other special privileges or advantages; controlling, regulating, pre-

venting, or destroying competition; pooling or apportioning earnings, losses, or traffic; allotting ports or restricting or otherwise regulating the number and character of sailings between ports; limiting or regulating in any way the volume or character of freight or passenger traffic to be carried; or in any manner providing for an exclusive, preferential, or cooperative working arrangement. The term "agreement" in this section includes understandings, conferences, and other arrangement. * * *"

375 F.2d—22

Counsel for the Commission contends that petitioner received an evidentiary hearing by virtue of its filing a memorandum of law and it oral argument before the Commission and that such hearing satisfied all of petitioner's statutory and constitutional rights to a hearing, since there were no disputed issues of fact and the question before the Commission was one of law. Since the Commission's finding that petitioner's dual-level rate agreement was not covered by any Commission approved rate making agreement was a final determination, counsel argues such determination may be enforced through a cease and desist order. Finally, counsel argues that the Commission's determination that the rate structure did not fall within petitioner's basic conference agreement is supported by law and that the Commission properly concluded that petitioner's rate system was an unfiled and unapproved rate agreement which violated Section 15 of the Act.

### III.

*Commission power to issue cease and desist orders:* Petitioner urges that the Commission has arrogated to itself power which Congress has repeatedly denied to it. Specifically, it notes that the Commission has asked the Congress in the years 1961, 1962, 1963 and 1965 for the power to issue cease and desist orders before full evidentiary hearings (see, *e. g.,* H.R.Rep.No.498, 87th Cong., 1st Sess., p. 22 (1961); Annual Reports of the Federal Maritime Commission, 1962, 1963; Hearings before the Sub-Committee on Federal Procurement and Regulation of the Joint Economic Committee, 89th Cong., 1st Sess., pp. 384–85 (1965)), and that Congress has just as often refused to grant respondent this power. The case of Trans-Pacific Freight Conference of Japan, et al. v. Federal Maritime Commission & U.S.A., 112 U.S.App. D.C. 290, 302 F.2d 875 (1962), is also cited by petitioner as judicial authority for the proposition that the Commission does not have this power.

In *Trans-Pacific, supra,* the cease and desist order was issued by the Commission as a result of a complaint to the Board by a member of a conference that it was being discriminated against and injured by actions of the conference. The member's complaint was made pursuant to Section 22 of the Shipping Act. However, pending the holding of hearings on this complaint, the Commission issued an order to the conference to show cause why it should not be ordered to cease and desist from the practices complained of, pending completion of the hearings under Section 22. The Board subsequently issued the cease and desist order, and the conference appealed to this court. After holding that the order of the Commission was final and reviewable, this court found that the Commission lacked power to issue such a cease and desist order pending final determination of the member's Section 22 complaint. 302 F.2d, at 878–879. We held that Section 22 required that a violation of the Act be found before a cease and desist order could issue and that there was no Section 15 question involved because the action enjoined was not an "agreement" or modification thereof within the meaning of those terms under Section 15. We concluded that neither Section 15 nor 22 supported the *pendente lite* cease and desist order issued by the Commission and that the legislative history of the Commission's attempt to acquire this power conclusively demonstrated that Congress had not acceded to the Commission's importunities.

In *Trans-Pacific*, however, we specifically noted that we were not deciding the question of whether the Commission had the power to issue a cease and desist order prohibiting the parties from carrying out an agreement that had not, but should have, been filed with the Commission for Section 15 approval. 302 F.2d, at 879, n. 8. The Commission's action in *Trans-Pacific* itself was directed to an action of the conference which was undertaken pursuant to the terms of the *approved* agreement. The question in that case was whether the conference's action *violated* the approved agreement.

In the instant case, the situation is different. Here the Commission is alleging that the dual-level tariff changes by the conference are of such a magnitude as to constitute a "new" Section 15 agreement which has not been filed with or approved by the Commission. Thus, the cease and desist order here speaks not to the enjoining of a violation of an approved agreement, but rather to the taking of action the nature of which requires that it be approved by the Commission as a Section 15 agreement.

The Commission supports its action by reference to American Export & Isbrandtsen Lines v. Federal Maritime Commission, 334 F.2d 185 (9th Cir. 1964). In that case, the Ninth Circuit upheld the issuance of a cease and desist order by the Commission in a situation closely analogous to that present here. There, the Commission issued an order directing the Pacific Coast European Conference to show cause why a port equalization system, filed as an amendment to the general rules section of the conference freight tariff, should not be declared unlawful and stricken from the tariff. The Commission limited the proceeding before it to the submission of affidavits of fact and memoranda of law. (No affidavits of fact were, however, filed.) The Commission found that the amendment to the freight tariff was not embraced within the conference's basic tariff agreement and, consequently, was an unfiled agreement in violation of Section 15. The Ninth Circuit approved the hearing accorded the petitioner and the action of the Commission in issuing the cease and desist order.

In addition to relying on *Isbrandtsen, supra,* to support its power to issue a cease and desist order after hearing and finding that conference action constituted a violation of Section 15, the Commission noted in its opinion in this case that:

"the power of this Commission to issue cease and desist orders preventing the carrying out of unapproved agreements is a necessary corollary to the requirement that such agreements obtain approval before they may be carried out [and this power] has been recognized by the courts. [Footnote 15. See, *e. g.,* Trans Pacific Frgt. Conf. of Japan v. Federal Maritime Com'n., 314 F.2d 928, 935–36 (9th Cir. 1963), upholding the Commission's issuance of a cease and desist order against the carrying out of modification of neutral body system without prior Commission approval.]"

We agree with the Commission that it is authorized to issue a cease and desist order after hearing to enjoin actions of a conference which are undertaken pursuant to an agreement, the nature of which requires it to be filed under Section 15. The *Trans-Pacific* case (*supra,* p. 338), and the legislative history relied upon by petitioner herein are not apposite. Those authorities speak only to a situation where the Commission attempts to issue a cease and desist order to enjoin *pendente lite* a violation of an *approved* Section 15 agreement.

Of course, we are not unaware that the line between action taken in violation of an approved Section 15 agreement and action constituting a new unfiled Section 15 agreement is seldom a clear and distinct one, and most often such line, if it exists at all, is shrouded by a vast penumbra of doubt. We believe, however, that the Commission is the properly constituted body to scrutinize the conference action and to determine initially upon which side of the line the conference action falls. A Commission determination that the conference action falls within or without the approved agreement must be given due deference by a reviewing court. See Consolo v. Federal Maritime Commission, 383 U.S. 607, 86 S.Ct. 1018, 16 L.Ed.2d 131 (1966).

The Commission must, of course, carefully determine whether the conference action falls within the statutory exception to Section 15 created by Congress in amending that section, Pub.

L. 87–346, 75 Stat. 762, 764, which exception provides that:

> "tariff rates, fares, and charges, and classifications, rules and regulations explanatory thereof * * * agreed upon by approved conferences, and changes and amendments thereto, if otherwise in accordance with law, shall be permitted to take effect without prior approval * * *."

This exception must be juxtaposed with the remainder of Section 15, the literal language of which could arguably be held to read the exception right out of Section 15. Congress has both given and taken away from the Commission in the enacting and amending of Section 15, and it is not entirely clear where the giving begins and the taking leaves off. The Commission must make a reasoned determination in each case, taking into account the practicalities of the marketplace and the decisional law on the question from the courts and Commission. Because of the difficulties attending precise discernment of the particular nature of each conference action, we believe the Commission should be as liberal as is possible, consistent with orderly administration, in granting a conference the opportunity to demonstrate initially that the subject action is embraced within the existing agreement.

The question remaining in this case is whether the hearing accorded petitioner satisfied the statutory requirements and, if so, whether the Commission's determination that the dual-level system constituted an unfiled Section 15 agreement is supported by law.

#### IV.

*Sufficiency of hearing:* Counsel for Commission concedes that a hearing was required here since this is an adjudication. It is contended, however, that this requirement was met, since there are no disputed questions of fact and petitioner was afforded an opportunity to submit a memorandum of law and was granted oral argument before the Commission. Petitioner argues that there are issues of fact here because it has alleged that it can prove that the dual-level system it has employed has been previously utilized in the trade and that these issues can be resolved only by a full evidentiary hearing as required by the provisions of Section 7(c) of the Administrative Procedure Act.[3] Petitioner points to the fact that in the order to show cause, no provision was made for the filing of affidavits of fact and that this is in contradistinction to consistent Commission practice, which has been to allow the parties to file such affidavits of fact. Respondent replies that affidavits of fact were not required here because the Commission had before it only the narrow question of whether the language of conference agreement No. 7700 was broad enough to encompass petitioner's dual-level system and that this was a question of law requiring only a scrutiny of the system and an interpretation of the agreement.

The question of what type hearing is required in an adjudicatory proceeding has traditionally been a vexing one for administrative agencies and courts alike. Davis, *Administrative Law Treatise,* Ch. 7 (1958 ed.). While it is true that Section 7(c) of the Administrative Procedure Act speaks in terms of a requirement of a trial-type evidentiary hearing, such an evidentiary hearing has not necessarily been required where the question involved has been essentially one of law. The rule was well stated in Producers Livestock Marketing Association v. United States, et al., 241 F.2d 192, 196 (10th Cir., 1957), aff'd *sub nom.,* Denver Union Stockyard Company v. Producers Livestock Marketing Ass'n, 356 U.S. 282,

---

3. Section 7(c) of the Administrative Procedure Act, 5 U.S.C. 1006(c) provides in relevant part:
   "Every party shall have the right to present his case or defense by oral or documentary evidence, to submit rebuttal evidence, and to conduct such cross-examination as may be required for a full and true disclosure of the facts."

78 S.Ct. 738, 2 L.Ed.2d 771 (1958), wherein the court stated:

"it is fundamental to the law that the submission of evidence is not required to characterize 'a full hearing' where such evidence is immaterial to the issue to be decided. In construing a similar provision of the Interstate Commerce Act, 49 U.S.C.A. § 1 et seq., the Supreme Court has defined a full hearing as one in which ample opportunity is afforded to all parties to make, by evidence and argument, a showing fairly adequate to establish the propriety or impropriety, from the standpoint of justice and law of the step asked to be taken. Akron, C. & Y. Ry. Co. v. United States, 261 U.S. 184, 43 S.Ct. 270, 67 L.Ed. 605. Where no genuine or material issue of fact is presented the court or administrative body may pass upon the issues of law after according the parties the right of argument. This was done in the instant case and constitutes a 'full hearing' for consideration of the limited contention made by the petitioner in its complaint and by its election not to submit evidence."

In the *Isbrandtsen* case, *supra,* the Ninth Circuit approved the previously delineated Commission action taken there and stated:

"In these circumstances, an evidentiary hearing is not required. Petitioners were given the opportunity to present legal memorandum, and the opportunity of oral argument. In the context of this case, they were entitled to no more." 334 F.2d, at 194.

While it is true that the show cause order in *Isbrandtsen* specifically provided that affidavits of fact should be filed, that none were filed, and that the decision could be made there as a matter of

law, and that the opposite tack was charted by the Commission here, we do not believe this factor sufficiently distinguishes the two cases. Here petitioner was afforded an opportunity at oral argument to denominate the facts in controversy and to explain their relevance and materiality. Moreover, no one has ever *disputed* the facts alleged by the petitioner. The Commission, rather, as we read its decision, concluded that even if such facts were true, they were insufficient to demonstrate that the dual-level system came within Agreement No. 7700. Further, petitioner did not allege that the dual-level system had ever been utilized previously pursuant to its conference agreement, which was the most pertinent fact relevant to determination of the question.

We believe, therefore, that in spite of the fact that the Commission failed to afford petitioner an opportunity to file affidavits of fact,[4] the petitioner was afforded an opportunity to demonstrate what facts it felt were material to the issue before the Commission. The Commission could properly have concluded that these facts were both undisputed and irrelevant to its decision and that the question ultimately determined by the Commission was one of law, which it could properly decide without providing petitioner a full trial-type evidentiary hearing.

### V.

*Requirement that the dual-level system be submitted for approval as a Section 15 agreement:* The Commission determined that the two-level rates contained in petitioner's tariffs are not in accordance with Agreement No. 7700. In so concluding, the Commission referenced five areas of commercial practice[5] in the

4. Even if the Commission believes that there are no issues of fact in a case, we believe that it would be better advised to be consistent in allowing parties an opportunity to file affidavits of fact in every case. Certainly much of the controversy in this case would have been foreshortened had petitioner had such opportunity. Moreover, such procedure would afford appellate courts a better record against which to evaluate the contentions of the parties and the conclusions of the Commission.

5. "Separate Section 15 approval has been required by the Commission and its predecessors of arrangements (1) introducing an entirely new scheme of rate com-

shipping industry where it has required separate Section 15 approval. It found that petitioner's "two-level system here involved comes within all five of them. No mention is made in the basic agreement of a system of rates based upon vessel flag; * * *."

The Commission concluded that petitioner's tariff authority under Article I of Agreement No. 7700 encompassed rate making authority only and did not extend to more basic and fundamental changes in the methodology of rate making.

We have reviewed the Commission's conclusions in this regard and find that they are in conformance with both court and Commission decisional law. The interpretation placed upon petitioner's activities by the Commission, and its reading of the basic agreement involved is a tenable one. We therefore affirm the Commission's decision. We desire to stress, however, that we are concerned only with the question of whether the dual-level system requires Section 15 approval. We intimate no opinion as to whether the system should be approved or disapproved, since this question rests initially with the Commission.

Affirmed.

bination and discrimination not embodied in the basic agreement (the dual rate contract); (2) representing a new course of conduct (prohibition of brokerage on a particular shipment); (3) providing new means of regulating and controlling competition (port equalization system); (4) not limited to the pure regulation of intraconference competition; or (5) constituting an activity by the nature and manner of effectuation of which cannot be ascertained by a mere reading of the basic agreement." (Footnotes omitted.)