**INTERPOOL LTD., et al., Petitioners,**

v.

**FEDERAL MARITIME COMMISSION and United States of America, Respondents,**

North Atlantic Conferences, Pacific Westbound Conference, etc., North Europe-US Pacific Coast Freight Conference, et al., The Coleman Company, Inc., et al., 3M Company and Anchor Hocking, Inc., Intervenors.

No. 79–1194.

United States Court of Appeals, District of Columbia Circuit.

Argued Jan. 23, 1980.

Decided Nov. 18, 1980.

Robert J. Wiggers, Atty., Dept. of Justice, Washington, D. C., with whom Barry Grossman and John J. Powers, III, Attys., Dept. of Justice, Washington, D. C., were on the brief, for respondents, United States of America.

John C. Cunningham, Atty., Federal Maritime Commission, Washington, D. C., with whom Edward G. Gruis, Deputy General Counsel, Federal Maritime Commission, Washington, D. C., was on the brief, for respondent, Federal Maritime Commission.

Robert B. Yoshitomi, San Francisco, Cal., with whom Edward D. Ransom, Thomas E. Kimball, and Richard C. Jones, San Francisco, Cal., were on the brief, for intervenor Pacific Westbound Conference and Far East Conference.

Neal M. Mayer, Paul D. Coleman, Washington, D. C., Howard A. Levy, Encino, Cal., and Patricia E. Byrne, San Francisco, Cal., were on the brief, for intervenor, North Atlantic Conferences.

David C. Nolan, San Francisco, Cal., was on the brief, for intervenor, North Europe—United States and Pacific Coast Freight Conference, et al.

Robert J. Ables, Washington, D. C., with whom Ronald J. Greene, Washington, D. C., was on the brief, for petitioners and intervenor, Coleman Co., Inc., et al.

Before ROBB, WILKEY and WALD, Circuit Judges.

Opinion for the Court filed by Circuit Judge ROBB.

ROBB, Circuit Judge:

Pursuant to 28 U.S.C. § 2342(3) (1976) and 46 U.S.C. § 830 (1976) petitioners seek review of an order of the Federal Maritime Commission (FMC) holding that certain amendments to the tariffs of various conferences of ocean carriers did not require its approval under section 15 of the Shipping Act of 1916, 46 U.S.C. § 814 (1976). The amendments in question prescribe the manner in which the conferences will apply their rates to cargo shipped in containers that are owned by neither the shipper nor the carriers. Because we find that the Commission misapplied the appropriate legal standard in making its decision, we vacate its order and remand the case for further proceedings.

*Background*

Shippers who transport goods in containers can receive their containers from various sources. They may use containers furnished by a carrier, containers which they own or lease themselves, or containers furnished to them by an independent container leasing company. Containers from these independent companies are often referred to as "neutral containers". The carriers' treatment of containerized cargo varies significantly depending upon the source of the container.

A shipper using a container furnished by a carrier must use that carrier to transport the goods when it is loaded. The shipper is also obliged to pay the cost of transporting the empty container to its location for loading. After the container is unloaded at the end of its journey, the shipper or the consignee is also responsible for returning the empty container to the carrier.

Shippers who use containers which they own or lease are not obligated to use a particular carrier. As a result a greater number of sailing dates are available to them. In addition, some conference tariffs allow a shipper furnishing its own container a discount from the rate normally applicable to the cargo shipped.

The third category—neutral containers—is the subject of this case. Neutral containers are owned by container leasing companies. These companies maintain large pools of containers and provide them to shippers without charge for their use. The leasing companies have entered into master agreements with individual inland and ocean carriers in which the carriers have agreed to transport loaded neutral containers tendered to them. The carriers charge the shippers the normal tariff rates applicable to their shipments, and pay the leasing company a per diem charge for the use of the container. The carriers are also responsible for returning the containers to the leasing companies after they are unloaded.

The neutral container system provides many advantages to shippers who make use of it. They may tender their cargo to any of the carriers which accept neutral containers, thereby allowing them a greater number of sailing dates from which to choose. In addition, under the neutral container system shippers are not responsible for any charges for transporting the empty containers. Until the adoption of the tariff rules at issue in this case, however, neutral

containers were not eligible for the discount allowed by some carriers to shippers who furnish their own containers.

From the carriers' viewpoint the neutral container system has several disadvantages. A carrier transporting cargo in a neutral container will realize less revenue than it would if it transported the same cargo in one of its own containers. This is due to the per diem charge it must pay to the container leasing company and the added transportation costs it must absorb.[1] Nevertheless carriers have been willing to enter into contracts with container leasing companies in order to obtain business from the shippers who use neutral containers. Apparently these are large companies which ship a great deal of merchandise, and carriers have been willing to accept lower profit margins on each container shipped in order to obtain the high volume of shipments from these large shippers.

As noted above, container leasing companies negotiate master agreements with individual carriers. Many of these carriers are members of ratemaking conferences, established by agreements among the carriers which have been approved by the Federal Maritime Commission pursuant to section 15 of the Shipping Act, 46 U.S.C. § 814 (1976).[2] In May 1976 several conferences[3] and Seatrain International, S.A., a participant in the Europe-Pacific Coast Rate Agreement, amended their tariffs on file

1. Although the record on this point is unclear, it also seems that a carrier will realize less revenue from transporting cargo in a neutral container than it would receive if it transported the cargo in a container furnished by the shipper, even if the carrier allows a discount to shippers who furnish their own containers. This discount is apparently less than the per diem charges collected by container leasing companies.

2. That section provides, in relevant part:
   Every common carrier by water, or other person subject to this chapter, shall file immediately with the Commission a true copy, or, if oral, a true and complete memorandum, of every agreement with another such carrier or other person subject to this chapter, or modification or cancellation thereof, to which it may be a party or conform in whole or in part, fixing or regulating transportation rates or fares; giving or receiving special rates, accommodations, or other special privileges or advantages; controlling, regulating, preventing, or destroying competition; pooling or apportioning earnings, losses, or traffic; allotting ports or restricting or otherwise regulating the number and character of sailings between ports; limiting or regulating in any way the volume or character of freight or passenger traffic to be carried; or in any manner providing for an exclusive, preferential, or cooperative working arrangement. The term "agreement" in this section includes understandings, conferences, and other arrangements.
   The Commission shall by order, after notice and hearing, disapprove, cancel or modify any agreement, or any modification or cancellation thereof, whether or not previously approved by it, that it finds to be unjustly discriminatory or unfair as between carriers, shippers, exporters, importers, or ports, or between exporters from the United States and their foreign competitors, or to operate to the detriment of the commerce of the United States, or to be contrary to the public interest, or to be in violation of this chapter, and shall approve all other agreements, modifications, or cancellations.

   Any agreement and any modification or cancellation of any agreement not approved, or disapproved, by the Commission shall be unlawful, and agreements, modifications, and cancellations shall be lawful only when and as long as approved by the Commission; before approval or after disapproval it shall be unlawful to carry out in whole or in part, directly or indirectly, any such agreement, modification, or cancellation; except that tariff rates fares, and charges, and classifications, rules, and regulations explanatory thereof (including changes in special rates and charges covered by section 813a of this title which do not involve a change in the spread between such rates and charges and the rates and charges applicable to noncontract shippers) agreed upon by approved conferences, and changes and amendments thereto, if otherwise in accordance with law, shall be permitted to take effect without prior approval upon compliance with the publication and filing requirements of section 817(b) of this title and with the provisions of any regulations the Commission may adopt. Section 15 also provides that agreements approved by the Commission are exempt from the antitrust laws.

3. The Continental North Atlantic Westbound Freight Conference, the North Atlantic Westbound Freight Conference, the Continental/U. S. Gulf Freight Association, and the North Europe-United States Pacific Freight Conference.

with the Commission in a manner designed to shift from the carriers to the shippers the costs of leasing neutral containers. All the rules adopted are substantially the same; the Continental North Atlantic Westbound Freight Conference's rule is typical.

> Any trailer/container, not owned or leased by a member line or affiliate thereof, prior to its delivery to a shipper for loading, shall be deemed to be a shipper-owned or leased trailer/container for the purpose of this rule and once so deemed, such trailer/container shall remain shipper-owned or leased for the entire duration of its transit both by water or by land and will not be interchanged with the carriers.[4]

The rules, known here as "neutral container rules," thus required all member carriers to treat neutral containers as though they were shipper-owned and thereby prohibited the carriers from making the per diem payments to the container leasing companies. They also relieved the carriers of responsibility for returning neutral containers to the container leasing companies after they are emptied. Under the new rules, neutral containers were eligible for the discount offered by some carriers to shippers who furnish their own containers. Petitioners allege, however, that this discount, when offered, is insufficient to offset the cost to the shipper of renting a neutral container.[5] While the conferences filed the rules with the Commission in accordance with 46 U.S.C. § 817(b) (1976), none of the conferences asked the Commission to approve the new rules pursuant to section 15, 46 U.S.C. § 814 (1976) before they went into effect.

*The Commission's Proceedings*

On June 16, 1976 American Export Lines, a member of one of the conferences that adopted the neutral container rules, peti-

tioned the Commission for a declaratory order holding that the Commission's approval was required under section 15 before the rules could be implemented. At about the same time, a number of container leasing companies and shippers informally complained to the Commission that the rules were not authorized by the conference agreements and therefore required separate approval by the Commission under section 15. In response, the Commission issued an order to show cause on June 24, 1976. The order required the conferences which had adopted these rules[6] to show why their adoption was not a concerted activity which "controls, regulates, prevents or destroys competition and which has been taken without prior Commission approval of such activity in violation of Section 15, Shipping Act, 1916." (J.A. at 14)

The Commission ordered that the proceeding "be limited to submission of affidavits of fact and memoranda of law, and replies thereto," and that any party who believed that an evidentiary hearing was required must specifically request it, setting forth in detail "the facts to be proven, their relevance to the issues in this proceeding, a description of the evidence which would be adduced to prove those facts, and why such proof cannot be submitted through affidavit." (J.A. at 15)[7]

The proceedings pursuant to the order to show cause were consolidated with American Export's petition for a declaratory order. The Institute of International Container Lessors, a trade association of container leasing companies, intervened in support of the position that the neutral container rules required the approval of the Commission before they could be implemented. Several large shippers and trade associations of freight forwarders and brokers also intervened in support of this posi-

---

4. Quoted in the Commission's opinion in this case at 5. (J. A. at 213) In June 1976 the conference eliminated the final phrase—"and will not be interchanged with the carrier."

5. See note 1 *supra.*

6. In addition to the conferences listed in note 3 *supra,* the Commission added the Pacific Coast

European Conference as a respondent. That conference had adopted a similar rule in 1973.

7. The respondent conferences were the only parties to request an evidentiary hearing. The Commission never expressly ruled upon this request.

tion. A number of conferences which had not adopted rules dealing with neutral containers intervened in support of the conferences named as respondents.

Shortly after the order to show cause was issued all the conferences but one cancelled their neutral container rules.[8] Some did so before the rules became effective, while others had the rule in effect for up to 40 days. Several parties suggested to the Commission that the suspension of the rules rendered the case moot.

■ More than two years after the final briefs were submitted, the Commission issued its decision. It held that the case was not moot even though the rules had been suspended, because "[a]n agreement subject to section 15 but not filed for approval is unlawful even though no action is taken under it." (J.A. at 218, n.19)[9] It went on to hold that the neutral container rules did not require separate approval under section 15 because they were "routine implementations of authority contained in [the carriers'] basic conference agreements." (J.A. at 218)

The Department of Justice then sought leave to intervene on behalf of the United States and presented a petition for reconsideration. Several shippers and container leasing companies also asked for reconsideration. The Commission denied the Justice Department's petition for leave to intervene

as untimely because it was filed over two and one half years after the proceeding commenced.[10] It also denied the other parties' petitions for reconsideration.

Petitioners[11] now seek review of the Commission's decision. The record does not indicate whether any of the conferences which originally adopted the rules reinstated them after the Commission's decision.

*Discussion*

The language of section 15 is broad. A carrier must obtain the Commission's approval of *"every agreement* with another such carrier, . . . or *modification* or cancellation thereof" if the agreement, among other things, controls or *regulates* competition. 46 U.S.C. § 814 (1976) (Emphasis added) If this language were read literally, it would apply to the neutral container rules, since they modify the existing conference agreements by prescribing the methods by which carriers will compete for cargo shipped in neutral containers.

It was early recognized, however, that literal application of the language of section 15 would lead to harsh results. For example, a conference that wished to adjust its rates to meet competition would be at a serious disadvantage if it were forced to wait for the Commission's approval before it could act. Conferences have solved this problem by including in their approved agreements only general language authoriz-

---

8. The one exception was the Pacific Coast European Conference, whose rule had been in effect since 1973. Some parties questioned whether that conference's rule was relevant to this case because there is no neutral container system on the West Coast. The Commission found the record inadequate for it to make any conclusion on this point. (J.A. at 217, note 18)

9. No party now contends that this case is moot. Since the Commission's decision allows the conferences to implement the neutral container rules and since petitioners argue that the Shipping Act does not permit the conferences to do so, a justiciable controversy regarding the correctness of the Commission's ruling clearly exists.

10. The Justice Department has not sought review of the denial of its petition for leave to intervene. Since the United States is a statutory respondent in all proceedings for review of the Commission's orders, *see* 28 U.S.C. § 2344

(1976), the Department has filed briefs in this court in support of petitioners.

On remand, since the Commission will for the first time be considering the question of the anti-competitive effect of the tariffs, the FMC might well benefit from the views of the Antitrust Division of the Department of Justice.

11. Petitioners are three container leasing companies—Interpool, Ltd., Itel Corp., and Trans-Ocean Leasing Corp. The North Atlantic Conferences which are intervenors before this court moved to dismiss the petition for review because these petitioners were not parties to the Commission proceedings. Their interests were represented by the Institute of International Container Lessors, a trade association to which they all belong. The motion to dismiss was denied by a motions panel of this court on July 13, 1979.

ing them to agree upon rates.[12] The conference members then proceed to agree upon specific rates and adjust them from time to time without submitting the agreed rates to the Commission for approval.

The procedure outlined above has received both administrative and legislative approval. In 1927 the Commission's predecessor ruled that it would not adopt a "too literal interpretation of the word 'every' [in section 15] to include routine operations relating to current rate changes and other day-to-day transactions between the carriers under conference agreements...." *Ex parte 4, Section 15 Inquiry*, 1 U.S.S.B. 121, 125 (1927). Such "routine operations", even though they involved agreements among competing carriers, were held to be outside the scope of section 15. In 1961 Congress amended the Shipping Act and expressly provided that "tariff rates[,] fares, and charges, and classifications, rules, and regulations explanatory thereof ... agreed upon by approved conferences, and changes and amendments thereto" are exempt from the requirement of prior Commission approval. 46 U.S.C. § 814 (1976).

In this case the Commission found that the neutral container rules were routine amendments authorized by the conference agreements which it had already approved. It therefore held that the conferences had acted properly in not submitting them for approval. Petitioners, joined by the Department of Justice on behalf of the United States, argue that the Commission erred because in reaching its decision it gave no consideration to the effects of the neutral container rules upon competition. We agree that the actual effect of the neutral container rules is a relevant factor for the Commission to consider and that it failed to do so. We therefore vacate its decision as arbitrary and capricious. *See* 5 U.S.C. § 706(2)(A) (1976); *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 416, 91 S.Ct. 814, 823, 28 L.Ed.2d 136 (1971); *United States Lines v. FMC*, 189 U.S.App.D.C.

361, 367–69, 584 F.2d 519, 525–27 (1978), and cases cited therein.

▮ The parties appear to agree upon the proper standard for the Commission to apply in determining whether tariff amendments like the ones involved here require separate approval under section 15. They all take the position that the Commission must decide whether the amendments restrict competition in a manner which can be reasonably inferred from the original conference agreement already approved by the Commission. If so, separate approval by the Commission is not required. (*See* Petitioners' Brief at 27–28; Brief for the United States at 11; Commission's Brief at 12) This standard has been applied by both the Commission and the courts. *See, e. g., Port of New York Authority v. FMC*, 429 F.2d 663, 666–68 (5th Cir. 1970), *cert. denied*, 401 U.S. 909, 91 S.Ct. 867, 27 L.Ed.2d 806 (1971); *Isbrandsten Co. v. United States*, 93 U.S.App.D.C. 293, 298, 211 F.2d 51, 56, *cert. denied*, 347 U.S. 990, 74 S.Ct. 852, 93 L.Ed. 1124 (1954); *Persian Gulf Outward Freight Conference*, 10 F.M.C. 61, 66 (1966), *aff'd*, 126 U.S.App.D.C. 159, 375 F.2d 335 (1967); *Pacific Coast European Conference*, 4 F.M.C. 696, 702–03 (1955). The same standard was endorsed by Congress as a guide to the proper scope of the 1961 amendment. *See* H.R.Rep.No. 498, 87th Cong., 1st Sess. at 19 (1961), U.S.Code Cong. & Admin.News 1961, 3108 (recommendations of the Department of Commerce which were incorporated into the bill). We hold that this is the appropriate standard by which to judge the Commission's actions in this case.

In this case the Commission did not apply this standard properly. Although it took note of allegations that the disputed rules would "control and regulate (if not destroy) the neutral container system" (J.A. at 217), the Commission did not consider what the actual effect of these rules upon competition would be. Instead, it simply relied upon the general ratemaking authority contained in the conference agreements:

---

12. *See* 46 C.F.R. § 522.6 (1979) (Commission's suggested language for conference agreements).

The conference agreements involved herein contain general authority to agree upon and establish rates and charges for the carriage of cargo, to agree upon and establish tariffs, and to make rules and regulations for handling and carrying cargo.... None of these agreements explicitly states that the conference may issue rules regulating the use of non-carrier-furnished containers. However, we view the general authorizing language in the basic conference agreements as sufficient authority for the issuance of these rules.

(J.A. at 219) (Footnote omitted)

■ The Commission erred by relying solely upon the language of the conference agreements. Although these conferences have been authorized to set rates and charges, the courts and the Commission have consistently held that similar general authorizations do not permit conferences to act in a manner that will affect competition in a manner unforseen when the conference agreements were approved. *See, e. g., Cancellation of Consolidation Allowance Rule,* 20 F.M.C. 858, 866 (1978) (agreement which allows rules regarding consolidation does not authorize conferences to prohibit payments to third parties who perform consolidation services; conduct authorized by the agreement must be determined by "consideration of external circumstances"); *Persian Gulf Outward Freight Conference, supra* (agreement authorizing "maintenance of agreed rates" does not authorize conference to set different rates for foreign and American flag vessels); *Pacific Coast European Conference, supra* (agreement authorizing conference to set rules for brokerage rates does not authorize conference to refuse to pay brokers who deal with non-conference carriers; *Isbrandsten Co. v. United States, supra* (agreement authorizing conference to set rates does not authorize it to set lower rates for shippers who agree to patronize only conference members). It is clear, therefore, that the Commission must look beyond the general language of the conference agreements and consider the actual effects of the neutral container rules before it can conclude that they are authorized by the agreements.

■ The Commission made no findings concerning the competitive effects of the neutral container rules, and petitioners and the intervening conferences disagree over what those effects are. Petitioners argue that the rules operate as a group boycott of container leasing companies by conference members. They contend that because the rules forbid carriers to pay the per diem fees charged by neutral container companies, the companies must turn to the shippers for payment. According to petitioners, most shippers are unlikely to pay for a neutral container, since carriers furnish containers free of charge. Thus, the effect of the rules is the elimination of the competition in the providing of containers that now exists between carriers and neutral container companies. Petitioners admit that the conference agreements authorize the carriers to eliminate competition among themselves, but argue that the Commission's approval of the conference agreements did not authorize the carriers to act in concert to eliminate competition from third parties who provide services to shippers, citing *Cancellation of Consolidation Allowance Rule, supra.*

The conferences argue that they are not engaging in a group boycott because the rules do not prohibit carriers from accepting neutral containers. In addition they contend that the neutral container system itself violates the antitrust laws because it is an unlawful tying arrangement. They say that carriers do not want to pay for neutral containers (the tied product), but they do so in order to obtain the cargo contained inside (the tying product). They view the neutral container rules as a means of regulating intraconference competition in order to protect themselves from the neutral container companies' violations of the antitrust laws. Furthermore, the conferences argue that the neutral container system results in the granting of rebates or prejudicial treatment in violation of the Shipping Act. *See* 46 U.S.C. §§ 815–17 (1976). According to this theory, the per diem charges paid to the container leasing

companies by the carriers benefit the shippers who use neutral containers, while other shippers who own or lease containers directly are not so benefited. Thus, the conferences view the neutral container rules as necessary to prevent violations of the Shipping Act by their members.

We intimate no view as to whether the petitioners or the conferences have correctly analyzed the effects of the rules. We have set forth their arguments to show that the question before the Commission— whether the neutral container rules restrict competition in a manner that can reasonably be inferred from the conference agreements—can only be answered by determining the actual impact of these rules upon competition. It cannot be resolved, as the Commission attempted to do, simply by reference to the general ratemaking authorizations contained in the conference agreements.

■ Counsel for the Commission argue that the Commission properly refused to discuss the effects of the new rules because petitioners never submitted affidavits of fact nor did they request a hearing for the purpose of offering evidence to support their view of what these effects would be. Therefore, counsel argue that the Commission had only a facially non-discriminatory rule before it, with no evidence of that rule's effects. We find this argument unpersuasive for several reasons.

First, the Commission's decision never states that there is inadequate evidence of the rules' effects. It relies solely upon the ratemaking authority granted to the conferences and never discusses the alleged lack of evidence. We think the argument by the Commission's attorneys on this point is an unacceptable *post hoc* rationalization of the agency's action. *See FPC v. Texaco Inc.*, 417 U.S. 380, 397, 94 S.Ct. 2315, 2326, 41 L.Ed.2d 141 (1974); *Burlington Truck Lines v. United States*, 371 U.S. 156, 167–69, 83 S.Ct. 239, 245–46, 9 L.Ed.2d 207 (1962).

Furthermore, the argument advanced by the Commission's attorneys ignores the fact that the Commission initiated this proceeding by means of an order to show cause. This order indicates that the Commission was aware of petitioners' allegations that the new rules would eliminate the neutral container system. (*See* J.A. at 8). The Commission stated that "[i]t ... appears that there may be significant competitive aspects to the proposed rules and that they may entail more than routine equipment practices of an operational nature." (J.A. at 10) The order also stated:

> It is clear that any new arrangement which creates new relationships which regulate and control competition is not conventional or routine rate-making and to be lawful must be expressly approved by the Commission in the basic agreement or in amendments thereto. This is especially true where the regulation attempted is not entirely intraconference and where there are third party interests affected by the concerted action.

(J.A. at 11)

The Commission issued its order in light of these considerations and the Commission's counsel admit that it "place[d] *on the conferences* the burden of coming forward with arguments and/or evidence as to why their tariff rules are within the scope of their approved agreements." (Br. at 38–39) (Emphasis added) *See also* 46 C.F.R. § 502.66 (1979) (Commission's order to show cause requires respondent to "present evidence"). By issuing an order to show cause, the Commission indicated its belief that petitioners' allegations were serious enough to require a response from the conferences. If the Commission wished to base its decision on the insufficiency of the evidence concerning the rules' effects, it would seem that it should have decided the issue against the party with the burden of proof, *i. e.*, against the conferences.

The most substantial reason for rejecting the arguments of the agency's attorneys is that in the circumstances presented by this case, the inadequacy of the factual record is not a sufficient ground for the Commission's decision, without further inquiry, that section 15 does not require it to approve the neutral container rules. If the record was

inadequate, the Commission was required to compile an adequate one, not simply to accept the position of the conferences. We find this case similar to *United States Lines v. FMC*, 189 U.S.App.D.C. 361, 584 F.2d 519 (1978). In that case the agreement before the Commission "on its face raised serious antitrust questions and presented the potential, nowhere denied by the Commission, that competition would be unduly restrained." *Id.* at 372, 584 F.2d at 530. We held that "the FMC has an independent statutory responsibility in the public interest to consider the factors set forth in section 15 of the Act, including the antitrust implications of the agreement, before granting its approval", *id.*, and that the Commission was required to resolve the antitrust questions that were clearly raised even though the protesting party did not initially offer to present specific evidence on those questions. Here, serious antitrust questions about the effects of the neutral container rules were raised by the Commission itself in the order to show cause, yet the Commission's decision fails to address them. This failure is inconsistent with the agency's independent responsibility to safeguard the public interest which we discussed in *United States Lines.*

The Commission and the intervening conferences seek to distinguish *United States Lines* because it involved a decision by the Commission to approve an agreement pursuant to section 15, unlike this case which concerns a decision that a particular rule was authorized by an agreement already approved by the Commission. We recognize the distinction, but we believe that *United States Lines* is applicable here as well. The Commission's duty to safeguard the public interest must extend to all its responsibilities under section 15, including its responsibility to decide whether an amendment to a conference agreement requires separate approval. A decision by the Commission that concerted activity by conference members is authorized by an agreement it has already approved has the same effect as a decision that the activity should be approved under section 15—the conferences are permitted to engage in that con-

duct immune from the provisions of the antitrust laws. If the Commission's scrutiny of tariff amendments is less thorough than its scrutiny of initial conference agreements, unnecessary anticompetitive restraints could be imposed upon the shipping industry and the public interest would be ill-served.

We emphasize that the Commission is not required to initiate an investigation *sua sponte* into the effects of every amendment to a conference tariff that is filed with it. Many amendments are undoubtedly routine changes, clearly authorized by the underlying conference agreements, and are not likely to be opposed. By contrast, this case is a contested one, and the Commission itself issued an order to show cause indicating its belief that petitioners' objections to these rules were worthy of further examination. In these circumstances the Commission did not satisfy its responsibility to safeguard the public interest by deciding the case without determining how the rules would affect competition and whether those effects were contemplated when the conference agreements were first approved.

*Conclusion*

Because the Commission misapplied the appropriate legal standard, we vacate its order and remand the case for further proceedings in accordance with this opinion. We do not decide whether the neutral container rules should be approved or disapproved by the Commission. That task is for the Commission to undertake initially subject to judicial review. *Cf. FMC v. Pacific Maritime Ass'n*, 435 U.S. 40, 54, 98 S.Ct. 927, 936, 55 L.Ed.2d 96 (1978) ("the regulation of competition in the shipping industry is to be an administrative function, subject to judicial review").

*Vacated and Remanded.*