**The PORT OF NEW YORK AUTHOR-ITY and Board of Commissioners of the Port of New Orleans, Petitioners,**

v.

**FEDERAL MARITIME COMMISSION and United States of America, Respondents.**

**No. 27722.**

United States Court of Appeals, Fifth Circuit.

July 31, 1970.

Arthur L. Winn, Jr., S. H. Moerman, Washington, D. C., Donald A. Lindquist,

Chaffe, McCall, Phillips, Burke, Toler & Sarpy, New Orleans, La., William W. Schwarzer, Mark O. Kasanin, Jack G. Knebel, McCutchen, Doyle, Brown & Enersen, San Francisco, Cal., for Pacific Coast Port Authorities.

William W. Schwarzer, A. T. Suter, Louis A. Schwartz, San Francisco, Cal., for Southern Pac. Co.

James M. Henderson, LaRoe, Winn & Moerman, Washington, D. C., Phelps, Dunbar, Marks, Claverie & Sims, New Orleans, La., Sidney Goldstein, General Counsel, Francis A. Mulhern, Newark, N. J., for Port of New York Authority.

Leslie Srager, Kominers, Fort, Schlefer, Farmer & Boyer, Washington, D. C., for Board of Commissioners of Port of New Orleans.

Sumter D. Marks, Jr., Phelps, Dunbar, Marks, Claverie & Sims, New Orleans, La., for Board of Commissioners of Port of New Orleans.

John N. Mitchell, Atty. Gen., U. S., U. S. Dept. of Justice, Kenneth H. Burns, Solicitor, Federal Maritime Comm., H. B. Mutter, Deputy Sol. Gen., Norman C. Barnett, Gen. Counsel, Federal Maritime Commission, Irwin A. Seibel, W. Richard Haddad, Attys., Dept. of Justice, Washington, D. C., for N. O. Traffic & Transportation Bureau.

Edward D. Ransom, San Francisco, Cal., Richard W. McLaren, Asst. Atty. Gen., James L. Pimper, General Counsel, for Pacific Westbound Conference and others.

Donald A. Lindquist, Chaffe, McCall, Phillips, Burke, Toler & Sarpy, New Orleans, La., Gordon L. Poole, R. Frederic Fisher, Lillick, McHose, Wheat, Adams & Charles, San Francisco, Cal., for Intervenor Steamship Conferences.

Before BELL, COLEMAN, and AINSWORTH, Circuit Judges.

BELL, Circuit Judge:

This petition to review an order of the Federal Maritime Commission has its historical roots in that phase of the transportation industry which began with the

completion of the transcontinental railroads some one hundred years ago. Competition between the Atlantic and Gulf Coast gateways on the one hand, and the Pacific Coast gateways on the other, for traffic moving between the Far East, Australia, and New Zealand and the central United States is the subject matter which gives rise to the petition to review. We affirm.[1]

Petitioners are operators of the two largest general cargo ports on the Atlantic and Gulf Coasts. They seek review of a final order and report of the Commission served February 24, 1969 in FMC Docket Nos. 65–31 and 66–61. These proceedings, in turn, arose out of another proceeding, entitled, Joint Agreement Between Member Lines of the Far East Conference and The Member Lines of the Pacific Westbound Conference, Docket No. 872, 8 F.M.C. 553 (1965).[2]

The issue in Docket No. 872 was whether certain agreements between two competing ocean shipping conferences were implemented without prior approval of the Commission. One of these agreements related to overland rates. The Commission decided that the validity of overland rates as such was not in issue in that proceeding but that it should be the subject of a separate proceeding. Accordingly, the Commission issued an order of investigation into the legality of overland rates. A group of shipping conferences, intervenors here,[3] together with their member lines operating out of Pacific Coast ports to ports in the Far East, Australia and New Zealand, were named as respondents in that proceeding. Docket No. 65–31. Petitioner New Orleans Port then filed a complaint, asserting the same issués against another conference, Pacific Coast Australasian Tariff Bureau, also an intervenor here. Docket No. 66–61. The two cases were consolidated for hearing and decision.

The central issue involves overland/O-CP [overland common point] ocean rates on cargo moving to and from the midwest portion of the United States. The overland rates are for outgoing traffic; the OCP rates are for incoming traffic. They are ocean rates in that they cover only the ocean portion of the freight movement. At issue also are certain absorption practices carried on by the shipping conferences in connection with the overland/OCP rates. It is the position of petitioners that the rates and practices in issue were promulgated in violation of § 15 of the Shipping Act, 46 U.S.C.A. § 814, in that they were not specifically approved by the Commission. They further contend that these rates and practices violate the §§ 16 First, and 17 of the Shipping Act which protect ports against unjust discrimination and undue prejudice. 46 U.S.C.A. §§ 815, 816. These contentions and their various counterparts will be discussed seriatim.[4]

1. See 28 U.S.C.A. § 2342(3) on jurisdiction to review the order in question.

2. Petitions to review the order of the Commission in Docket No. 872 are pending for decision in this court. No. 23209, Board of Commissioners of the Port of New Orleans, Port of New York Authority and the North Atlantic Port Association v. The Federal Maritime Commission and United States of America; and No. 23506, Pacific West Bound Conference and Far East Conference v. Federal Maritime Commission and United States of America.

3. The following were respondents in Docket 65–31: Pacific Westbound Conference; Trans-Pacific Freight Conference of Japan; Trans-Pacific Freight Conference (Hong Kong); Philippines North America Conference; Australia, New Zealand and South Sea Islands Pacific Coast Conference; Pacific-Straits Conference and Pacific/Indonesian Conference.

4. After this matter was assigned to a hearing examiner, petitioners requested summary determination, without an evidentiary hearing, of the legality of the rates under § 15 of the Shipping Act. This request was rejected by the examiner and later by the Commission. Petitioners then sought review of the order of the Commission is that regard in this court. Meanwhile the Commission proceeding went forward, extensive hearings were held, and the instant order was rendered. We have now rejected the petition for review based on the failure to summarily

■■ It is to be noted preliminarily that this review is in the frame of reference of a review involving the expertise of an administrative agency. Moreover, the § 15 question as to whether the rates and practices should have been filed for specific approval embraces the question of the Commission interpreting the scope of its own prior approval of the several conference agreements. As to fact questions, we must consider whether the order in question is supported by substantial evidence. We are not to review the matter de novo nor are we to substitute our discretion for that of the Commission. Congress created the Commission to provide a forum for the solution of the technical and complex matters involved in the shipping industry. Consolo v. Federal Maritime Commission, 1966, 383 U.S. 607, 618–621, 86 S.Ct. 1018, 16 L. Ed.2d 131; Far East Conference v. United States, 1952, 342 U.S. 570, 573–576, 72 S.Ct. 492, 96 L.Ed. 576; Swayne

& Hoyt v. United States, 1937, 300 U.S. 297, 303–304, 57 S.Ct. 478, 81 L.Ed. 659; United States Navigation Co. v. Cunard Steamship Co., 1932, 284 U.S. 474, 485, 52 S.Ct. 247, 76 L.Ed. 408.

We thus must determine whether the order under review is supported by substantial evidence and is otherwise in accord with subsisting law.

### Section 15

The discussion under this section will be limited, insofar as possible, to the filing requirements of § 15. That section also provides, in the event that filing is required, that the agreement which is filed shall not be approved if the Commission finds it to be unjustly discriminatory or unfair as between ports, among others, or that it operates to the detriment of the United States, that it is contrary to the public interest, or otherwise in violation of the Shipping Act.[5] Consideration of these prerequisites for ap-

---

determine the legality of the rates and practices. See Port of New York Authority v. Federal Maritime Commission, 5 Cir., 1970, 429 F.2d 670.

5. Section 15 (46 U.S.C.A. § 814), provides in pertinent part:

Every common carrier by water, or other person subject to this chapter, shall file immediately with the Commission a true copy, or, if oral, a true and complete memorandum, of every agreement, with another such carrier or other person subject to this chapter, or modification or cancellation thereof, to which it may be a party or conform in whole or in part, fixing or regulating transportation rates or fares; giving or receiving special rates, accommodations, or other special privileges or advantages; controlling, regulating, preventing, or destroying competition; pooling or apportioning earnings, losses, or traffic; allotting ports or restricting or otherwise regulating the number and character of sailings between ports; limiting or regulating in any way the volume or character of freight or passenger traffic to be carried; or in any manner providing for an exclusive, preferential, or cooperative working arrangement. The term "agreement" in this section includes understandings, conferences, and other arrangements. The Commission, shall by order, after

notice and hearing, disapprove, cancel or modify any agreement, or any modification or cancellation thereof, whether or not previously approved by it, that it finds to be unjustly discriminatory or unfair as between carriers, shippers, exporters, importers, or ports, or between exporters from the United States and their foreign competitors, or to operate to the detriment of the commerce of the United States, or to be contrary to the public interest, or to be in violation of this chapter, and shall approve all other agreements, modifications, or cancellations. * * *

* * * * * *

Any agreement and any modification or cancellation of any agreement not approved, or disapproved, by the Commission shall be unlawful, and agreements, modifications, and cancellations shall be lawful only when and as long as approved by the Commission; before approval or after disapproval it shall be unlawful to carry out in whole or in part, directly or indirectly, any such agreement, modification, or cancellation * * *.

Every agreement, modification, or cancellation lawful under this section * * * shall be excepted from the provisions of section 1–11 and 15 of Title 15, and amendments and Acts supplementary thereto.

proval, to the extent involved, will be reserved for discussion with the contentions having to do with §§ 16 First, and 17.

Each of the conferences serves a distinct trade between or via Pacific Coasts ports and the Far East, New Zealand or Australia. They do not compete with each other for traffic. Conferences are associations of steamship lines whose principal function is to agree on rates in their particular trade. Each of the conferences here operates under an agreement which has been approved by the Commission pursuant to § 15. We have examined these agreements and it appears that each agreement authorizes the parties to the conference to agree upon matters involving tariffs, rates or other charges in the particular trade served by the conference. We take it that this much is undisputed.

■ The dispute arises over the finding by the Commission that the overland/OCP rates in question and the practices involving the absorption of terminal charges were routine matters under the conference agreements, theretofor approved, and thus not required to be filed for § 15 approval. Petitioners urge the incorrectness of this finding, contending that they were the kind of rates and practices which required the specific approval of the Commission under § 15.

The evidence developed before the Commission demonstrated that overland/OCP type rates had been in use since shortly after the completion of the first transcontinental railroad in 1869. The practice of absorbing certain terminal charges was also of long standing. Such rates made alternate routes available to shippers located in the midwest over and above the Atlantic, Gulf Coast and Great Lakes gateways. The rates and practices in question had their genesis in competition for this midwest traffic. Each of the gateways had built-in advantages.

The Great Lakes gateways were more proximate but seasonal. The Atlantic and Gulf Coast gateways were nearer the traffic than the Pacific gateways and were not burdened by seasonal considerations. However, in comparison the Pacific gateways were from 2,000 to 4,500 miles and many days closer to the relevant foreign ports.

The Commission had long known of the existence of these types of rates and practices. Indeed, the Supreme Court discussed similar rates for import-export traffic in Texas and Pacific Railroad v. Interstate Commerce Commission, 1896, 162 U.S. 197, 16 S.Ct. 666, 40 L.Ed. 940.[6] The court there established the principle that it was not unlawful for railroads to take competition into account as a factor in charging a lower rate for import-export traffic than for domestic traffic between the same points. Here, as there, the essence of petitioner's complaint is that the conferences charge higher local rates, i.e., traffic to and from those areas of the United States which lie west of the Rocky Mountains, than for the midwest areas subject to the overland/OCP rates.

The evidence of record also demonstrates that the early conference agreements, in some instances, specifically referred to overland traffic and rates, and that tariffs providing separate rates for overland/OCP traffic were issued. The Commission concluded that it intended to sanction overland/OCP rate making and the absorption practices when it approved the basic agreements of the conference. There was no secret concerning the rates; separate tariffs for local and overland traffic had long been published.

It is true that the absorption agreements having to do with terminal costs were worked out jointly between the conferences and the railroads and the Commission has jurisdiction only over common carriers by water. This, however,

6. Overland/OCP ocean rates are analogous to import-export railroad rates and are to be distinguished from local rates. Railroads offer a lower than normal rate to be used in conjunction with overland/ OCP (ocean) rates. These lower rates are set on a near parity basis to make Pacific Coast gateways competitive with Atlantic, Gulf and Great Lakes gateways.

in no way detracts from the finding that the absorption agreements were routine and within the contemplation of the agreements of the conferences as approved by the Commission. The record supports the conclusion that the absorption agreements were incidental to rate making which, in turn, was based upon normal economic factors such as cost and competition.

The Commission reasoned that recognition of such rate making for more than forty years emphasized the fact that when the agreements of the conferences were approved, the Commission envisaged the use of overland/OCP rates with attendant absorption practices, and that such rates and practices constituted no more than routine rate making. This conclusion is well supported by the record unless, as petitioners further contend, the rates and practices were unduly prejudicial and preferential in violation of § 16 First, discriminatory against ports in violation of § 17, or constituted agreements unjustly discriminatory as between ports under § 15 of the Shipping Act.

### Section 16 First, and 17

This contention brings into play the doctrine of dual rate systems, the port equalization rule, the natural tributary policy of § 8 of the Merchant Marine Act

of 1920, 46 U.S.C.A. § 867, as well as predatory rate concepts.

The regulatory pattern of the Shipping Act is to be found in §§ 15, 16, 17 and 18. Section 18, 46 U.S.C.A. § 817, requires that common carriers by water establish and observe just and reasonable rates and that these rates be filed. The Commission is required to prescribe rates and practices when the rates established by the carriers are unjust or unreasonable. The procedures established in this section are not in issue here.

As noted, § 15 of the Act proscribes agreements which are unjustly discriminatory as between ports, among others, or which operate to the detriment of the commerce of the United States, or which are contrary to the public interest. The carriers are expressly exempt from the antitrust laws where the agreements are lawful under § 15. Section 16 First makes it unlawful for a common carrier by water to give any undue or unreasonable preference to any particular person or locality. Section 17 provides that no carrier is to demand, charge or collect a rate which is unjustly discriminatory between shippers or ports.[7]

Section 8 of the Merchant Marine Act, supra, is a policy statement designed to promote and encourage the use of ports by vessels for the handling of freight which would naturally pass through such ports. This is the basis of the natural tributary argument.[8]

7. Section 16 (46 U.S.C.A. § 815), provides in pertinent part:

It shall be unlawful for any common carrier by water, or other person subject to this Act, either alone or in conjunction with any other person, directly or indirectly—

First. To make or give any undue or unreasonable preference or advantage to any particular person, locality, or description of traffic in any respect whatsoever, or to subject any particular person, locality, or description of traffic to any undue or unreasonable prejudice or disadvantage in any respect whatsoever * * *.

Section 17 (46 U.S.C.A. § 816), provides in pertinent part:

No common carrier by water in foreign commerce shall demand, charge, or

collect any rate, fare, or charge which is unjustly discriminatory between shippers or ports, or unjustly prejudicial to exporters of the United States as compared with their foreign competitors. Whenever the Federal Maritime Board finds that any such rate, fare, or charge is demanded, charged, or collected it may alter the same to the extent necessary to correct such unjust discrimination or prejudice and make an order that the carrier shall discontinue demanding, charging, or collecting any such unjustly discriminatory or prejudicial rate, fare, or charge.

8. Section 8 of the Merchant Marine Act, (46 U.S.C.A. § 867), provides:

It shall be the duty of the Secretary of Commerce, in cooperation with the

We first dispose of any predatory rate argument which may inhere in the case. The short answer is that there is no evidence of predatory pricing. The rates are based on normal considerations including competition. Moreover, it is evident that petitioners have not been driven from the market. They share in the market in a substantial way and their share in the Far East trade is increasing rather than declining. Should petitioners prevail here, their share would, of course, increase in a spectacular manner through the elimination of competition but to state the fact is not to justify the elimination.

Petitioners would have us equate local rates vis a vis overland/OCP rates with a dual rate system such as was held impermissible in Federal Maritime Board v. Isbrandtsen Company, 1958, 356 U.S. 481, 78 S.Ct. 851, 2 L.Ed.2d 926. There a shipper would pay less than regular rates if he signed an exclusive patronage contract with the shipping conference. This stratagem was designed to curtail competition with a non-conference shipping line. Dual rates are not the same as or similar to overland/OCP rates. Dual rates would stifle non-conference competition; to the contrary, overland/OCP rates enhance competition by providing alternate transportation routes. The dual rate doctrine is not applicable to the facts here.

We have also noted the case of Persian Gulf Outward Freight Conference v. Federal Maritime Commission, 1967, 126 U.S.App.D.C. 159, 375 F.2d 335, where a conference sets separate rates for cargo on the basis of whether a carrier flew the American or a foreign flag. This type of dual rate system bears no resemblance to the overland/OCP rates and practices here.

Petitioners also rely on the port equalization rule. This rule arises where a practice is inaugurated which would allow a carrier conference member not to stop at a port normally served by the carrier. Instead, the carrier would arrange for the cargo to be moved to another port actually served. The carrier would pay the difference in the cost of the transportation of the cargo from the port nearest the point of origin or destination of the cargo to the port actually served. Such a practice may or may not be unjustly discriminatory or prejudicial to the port not served. The Commission in its expertise determines these questions by weighing the benefits to the carrier, the effect on the shipper, the effect on the port which is not served,

Secretary of the Army, with the object of promoting, encouraging, and developing ports and transportation facilities in connection with water commerce over which he has jurisdiction, to investigate territorial regions and zones tributary to such ports, taking into consideration the economies of transportation by rail, water, and highway and the natural direction of the flow of commerce; to investigate the causes of the congestion of commerce at ports and the remedies applicable thereto; to investigate the subject of water terminals, including the necessary docks, warehouses, apparatus, equipment, and appliances in connection therewith, with a view to devising and suggesting the types most appropriate for different locations and for the most expeditious and economical transfer or interchange of passengers or property between carriers by water and carriers by rail; to advise with communities regarding the appropriate water terminals; to investigate the practicability and advantages of harbor, river, and port improvements in connection with foreign and coastwise trade; and to investigate any other matter that may tend to promote and encourage the use by vessels of ports adequate to care for the freight which would naturally pass through such ports: *Provided,* That if after such investigation the board shall be of the opinion that rates, charges, rules, or regulations of common carriers by rail subject to the jurisdiction of the Interstate Commerce Commission are detrimental to the declared object of this section, or that new rates, charges, rules, or regulations, new or additional port terminal facilities, or affirmative action on the part of such common carriers by rail is necessary to promote the objects of this section, the Secretary may submit its findings to the Interstate Commerce Commission for such action as such commission may consider proper under existing law.

and public interest as a whole. See Stockton Port District v. Federal Maritime Commission, 9 Cir., 1966, 369 F.2d 380; American Export & Isbrandtsen Lines v. Federal Maritime Commission, 9 Cir., 1964, 334 F.2d 185; and Pacific Far East Line v. United States, 1957, 101 U.S.App.D.C. 24, 246 F.2d 711.

 The port equalization argument is buttressed by § 8 of the Merchant Marine Act, supra, which is a statement of congressional policy. The policy is to promote the development of ports and transportation facilities on a natural tributary basis. This policy is to be given weight by the Commission in determining questions of discrimination or prejudice toward a port but we do not perceive that § 8 requires as a matter of law, that the Commission disallow equalization practices simply because the complaining port has a lower inland mileage and rate advantage. Additionally, we are not prepared to hold that the midwestern portion of the United States is naturally tributary to petitioner ports. No authority has been called to our attention which would extend the natural tributary scope of § 8 to such limits.

As respects the port equalization argument, we conclude that the rates and practices in question here were not unjust or unreasonably discriminatory or prejudicial toward petitioners. This conclusion is supported by the facts of record and the appertaining law.

At bottom, the rates and practices under attack stem from competition. The Commission did not err in holding that they were not unduly prejudicial or discriminatory to petitioner ports. The record supports such a holding from the standpoint of the interest of petitioner ports and the Pacific Coast ports as well as carriers, forwarders, and shippers and receivers of cargo. The balance drawn by the Commission is sustained.

### ADDITIONAL ISSUES

 Petitioners contend that they were denied administrative due process in several particulars including the refusal to issue certain subpoenas duces tecum. We find no abuse of discretion in these matters and the contention is therefore rejected.

All additional assertions of petitioners have been considered and are deemed to be without merit.

Affirmed.