**BOARD OF COMMISSIONERS of the PORT OF NEW ORLEANS, the Port of New York Authority, and the North Atlantic Ports Association, Petitioners,**

v.

**FEDERAL MARITIME COMMISSION and United States of America, Respondents,**

**Pacific Westbound Conference, Intervenor.**

**No. 23209.**

United States Court of Appeals, Fifth Circuit.

March 19, 1971.

Mark P. Schlefer and James Henderson, Washington, D. C., Sumter D. Marks, Jr., New Orleans, La., for petitioners.

James L. Pimper, Gen. Counsel, Edward Gruis, Deputy Gen. Counsel, Kenneth N. Burns, Sol., Walter H. Mayo, III, and Norman C. Barnett, Attys., Federal Maritime Commission, Washington, D. C., and Irwin A. Seibel, Atty., Dept. of Justice, Washington, D. C., for Federal Maritime Commission and United States.

Edward D. Ransom, San Francisco, Cal., for intervenor.

Before THORNBERRY, GOLDBERG and AINSWORTH, Circuit Judges.

AINSWORTH, Circuit Judge:

This is a petition by the Ports of New York and New Orleans and the North Atlantic Ports Association to review a part of the report and orders of the Federal Maritime Commission having a significant effect on ocean freight rates and joint ratemaking of two large conferences of common carrier shipping companies [1] engaged in transportation of cargo between United States ports and the Far East. Major issues relating to the antitrust policy of the United States are involved. The question is whether certain of the Commission's findings in its report and orders are erroneous and violative of the Shipping Act, 1916 (46 U.S.C. §§ 801–842), especially Section 15 thereof (46 U.S.C. § 814).[2] More specifically petitioners assert that the Commission erred in not

1. "Steamship conferences are groups of voluntary associations of ocean common carriers formed so that the members may agree upon rates and certain other competitive practices." See Report Senate Committee on Commerce, "Steamship Conferences and Dual Rate Contracts," S.Rep.No.860, 87th Cong., 1st Sess. 4.

2. Section 15 of the Shipping Act, 1916 (46 U.S.C. § 814), reads in pertinent part as follows:
§ 814. Contracts between carriers filed with Commission; definition of "agreement"; approval, disapproval, etc. by Commission; unlawful execution of agreements; conference agreements and antitrust laws exemptions;
civil actions for penalties; terminal leases exemption
Every common carrier by water, or other person subject to this chapter, shall file immediately with the Commission a true copy, or, if oral, a true and complete memorandum, of every agreement with another such carrier or other person subject to this chapter, or modification or cancellation thereof, to which it may be a party or conform in whole or in part, fixing or regulating transportation rates or fares; giving or receiving special rates, accommodations, or other special privileges or advantages; controlling, regulating, preventing, or destroying competition; pooling or apportioning earnings, losses, or

ordering Pacific Westbound Conference to cancel, or cease to implement its overland freight tariff, until the conference had filed with and secured Commission approval of its overland rate system. Pacific Westbound Conference has intervened.

Importance of the present case is underscored by consideration of the purposes of the Shipping Act, 1916. The Act grants antitrust exemption to common carrier shipping companies who enter into agreements providing for uniform freight rates and charges, provided the carriers comply with the regulatory provisions of the Act.

The proceedings upon which the review is taken were instituted by the Federal Maritime Board (now Commission) under Docket No. 872 entitled *Joint Agreement Between Member Lines of the Far East Conference and the Member Lines of the Pacific Westbound Conference.*[3] By its initial order of October

traffic; allotting ports or restricting or otherwise regulating the number and character of sailings between ports; limiting or regulating in any way the volume or character of freight or passenger traffic to be carried; or in any manner providing for an exclusive, preferential, or cooperative working arrangement. The term "agreement" in this section includes understandings, conferences, and other arrangements.

The Commission shall by order, after notice and hearing, disapprove, cancel or modify any agreement, or any modification or cancellation thereof, whether or not previously approved by it, that it finds to be unjustly discriminatory or unfair as between carriers, shippers, exporters, importers, or ports, or between exporters from the United States and their foreign competitors, or to operate to the detriment of the commerce of the United States, or to be contrary to the public interest, or to be in violation of this chapter, and shall approve all other agreements, modifications or cancellations. No such agreement shall be approved, nor shall continued approval be permitted for any agreement (1) between carriers not members of the same conferences of carriers serving different trades that would otherwise be naturally competitive, unless in the case of agreements between carriers, each carrier, or in the case of agreements between conferences, each conference, retains the right of independent action, or (2) in respect to any conference agreement, which fails to provide reasonable and equal terms and conditions for admission and readmission to conference membership of other qualified carriers in the trade, or fails to provide that any member may withdraw from membership upon reasonable notice without penalty for such withdrawal.

The Commission shall disapprove any such agreement, after notice and hearing, on a finding of inadequate policing of the obligations under it, or of failure or refusal to adopt and maintain reasonable procedures for promptly and fairly hearing and considering shippers' requests and complaints.

Any agreement and any modification or cancellation of any agreement not approved, or disapproved, by the Commission shall be unlawful, and agreements, modifications, and cancellations shall be lawful only when and as long as approved by the Commission; before approval or after disapproval it shall be unlawful to carry·out in whole or in part, directly or indirectly, any such agreement, modification, or cancellation; except that tariff rates, fares, and charges, and classifications, rules, and regulations explanatory thereof (including changes in special rates and charges covered by section 813a of this title which do not involve a change in the· spread between such rates and charges and the rates and charges applicable to noncontract shippers) agreed upon by approved conferences, and changes and amendments thereto, if otherwise in accordance with law, shall be permitted to take effect without prior approval upon compliance with the publication and filing requirements of section 817(b) of this title and with the provisions of any regulations the Commission may adopt.

Every agreement, modification, or cancellation lawful under this section, or permitted under section 813a of this title, shall be excepted from the provisions of sections 1–11 and 15 of Title 15, and amendments and Acts supplementary thereto.

Whoever violates any provision of this section or of section 813a of this title shall be liable to a penalty of not more than $1,000 for each day such violation continues, to be recovered by the United States in a civil action: * * *

3. The Commission decision is reported at 8 F.M.C. 553.

26, 1959 in Docket No. 872, the Board on its own motion began an investigation into joint Conference Agreement No. 8200 between the member lines of the Far East Conference (FEC) and Pacific Westbound Conference (PWC) heretofore approved by the Board on December 29, 1952 pursuant to Section 15 of the Shipping Act, 1916. The Board's order stated that protests against the agreement had been received from "shippers and other persons," and accordingly it instituted an investigation to determine whether Agreement No. 8200 "is a true and complete agreement of the parties within the meaning of said Section 15 and whether it is being carried out in a manner which makes it unjustly discriminatory or unfair between carriers, shippers, exporters, or ports, or between exporters from the United States and their foreign competitors, or to operate to the detriment of the commerce of the United States, or to be in violation of the Shipping Act, 1916, as amended." The Far East Conference and Pacific Westbound Conference were made respondents in the Commission proceeding and numerous interested parties intervened.

Hearings were held, an Examiner's report was filed, and ultimately the Commission entered its report and order dated July 28, 1965, in which it found "insufficient evidence to disapprove Agreement No. 8200," but "that the various supplementary agreements affecting overland rates, the concurrence procedures, and the placement of items on the initiative list, constitute unapproved agreements which should have been filed with us for action pursuant to section 15; and not having been so filed and approved the parties to Agreement No. 8200 are hereby ordered to cease and desist from carrying them out." Respondents FEC and PWC were ordered to cease and desist from carrying out the supplementary agreements "until

filed with and approved by the Commission." Later, on November 1, 1965, a further report on petitions for reopening and clarification was made by the Commission which concluded that " * * * there exists no *approved* agreement which permits joint rate action between PWC and FEC." (Emphasis by the Commission.)

Two separate petitions to review the Commission's report and orders were then filed, namely, the present petition of the Ports, and another related petition by Pacific Westbound Conference and Far East Conference, Docket No. 23506 of this Court also decided today, 440 F.2d 1303.

It developed that one of the key issues before the Commission was the lawfulness of overland and OCP (overland common point) ocean rates on cargo moving to and from points in the United States east of the Rocky Mountains and points in the Far East.[4] These rates had been dealt with in one of the supplementary agreements to Agreement No. 8200 between FEC and PWC. As noted in the Commission's report, there were other important supplementary agreements between the two conferences pursuant to Agreement No. 8200. These referred to the placement of items on an initiative list and concurrence procedures between the conferences and are the subject of the companion petition for review of PWC and FEC in this Court's Docket No. 23506. None of these supplementary agreements has ever been filed with or approved by the Commission.

The Pacific Westbound Conference basic agreement, Agreement No. 57, between a number of Pacific Coast ocean carriers engaged in trade between Pacific Coast ports and the Far East, has a long history having been approved by the Commission effective on January 1, 1923. PWC has had an overland rate structure in its tariff since its begin-

---

4. "Generally, overland rates are outbound ocean rates, while OCP rates are inbound ocean rates, although there is no substantial difference in their nature or purpose and the distinction in terminology is not always observed." Investigation of Overland/OCP Rates & Absorptions, 12 F.M.C. 184, 188 (1969).

ning in 1923 whose purpose was to make PWC competitive with FEC for traffic originating at points on the interior of the United States. By this procedure PWC reduced its ocean rates on commodities originating in overland territory (i. e., points east of the Rocky Mountains) below its rates on commodities originating in local territory (i. e., points west of the Rocky Mountains) to an amount equal to the rates shippers would pay, after adding their inland railroad rates, if they used Far East Conference members from either Atlantic or Gulf of Mexico Coast ports to the Far East. Thus PWC overland's rates, arrived at between members of that conference, to meet competition of Atlantic and Gulf ports to points in Midwestern United States, have been employed continuously since the time the PWC conference agreement was originally approved by the Commission.[5]

From the outset it was made clear by the Commission's Examiner that the approvability of overland rates as such was not at issue in the proceeding and that the legality of overland rate agreements would be considered by the Commission in a separate proceeding.

On August 13, 1965, only fifteen days after the Commission issued its report and order in Docket No. 872, dated July 28, 1965, the Commission in Docket No. 65–31, Investigation of Overland and OCP Rates and Absorptions, instituted a comprehensive investigation into the legality of overland/OCP rates. Extended hearings were required and after an Examiner's report was issued, the Commission in a report and order dated February 20, 1969 (12 F.M.C. 184) found that the "establishment of overland/OCP rates was explicitly sanctioned by the ratemaking authority of the conferences," as "routine ratemaking." The Commission in its report said: "We have found that the organic agreements permitted the OCP rates as routine ratemaking. Our holding is based largely upon the history and development of the system and the full knowledge of the Commission and its predecessors. The overland/OCP system was old and established at the commencement of governmental regulation of waterborne commerce." (12 F.M.C. at 208–209.) [6]

The Port of New York Authority and Board of Commissioners of the Port of New Orleans petitioned this Court for

---

5. The Far East Conference is also an association of ocean carriers under an approved Commission agreement (Agreement No. 17) ; its carriers operate from Atlantic and Gulf ports of the United States to the Far East.

6. A further understanding of the complicated overland rate system may be obtained by reference to the following excerpts from the Commission's report in Investigation of Overland/OCP Rates & Absorptions, 12 F.M.C. 184 (1969):
    "Overland/OCP tariffs are designed to meet the competition of ocean carriers operating out of Gulf and Atlantic Coast ports to and from the same foreign ports with respect to cargo originating in or destined for the Central or Midwest United States. For such cargo, the effect of overland/OCP tariffs is to make the aggregate freight charge for inland rail plus ocean transportation via the Pacific Coast gateway competitive with such aggregate charge via the Atlantic or the Gulf gateway. No attempt is made to meet

the aggregate freight charge via Great Lakes ports."
    Id. at 187, 188.
    "Overland/OCP cargo originates or terminates primarily in the Midwest where Atlantic and Gulf ports have an advantage over Pacific Coast ports in the matter of inland transportation rates. On the other hand, Pacific Coast ports are closer by more than 4,000 miles to major ports in the Far East and by more than 2,000 miles to Australia and New Zealand.
    "As a general rule, in the case of any overland/OCP rate, the aggregate of the corresponding local ocean rate and the inland rail rate to or from the predominant Midwest point of origin or destination of the particular commodity is greater than the aggregate of the ocean rate via either the Gulf or Atlantic Coast and the inland rail rate to or from such Coast; and that the overland/OCP rate, including the assumption of terminal charges, is less than the local rate."
    Id. at 200, 201.

a review of the Commission's report and order of February 20, 1969 in Docket No. 65–31. However, a panel of the Court affirmed the Commission's findings on July 31, 1970. See The Port of New York Authority and Board of Commissioners of the Port of New Orleans v. Federal Maritime Commission, et al., 5 Cir., 1970, 429 F.2d 663, cert. denied, 401 U.S. 909, 91 S.Ct. 867, 27 L.Ed.2d 806 (1971). In the cited case we agreed with the Commission that it had sanctioned overland/OCP ratemaking and absorption practices "when it approved the basic agreements of the conference" (Id. at 667); that the use of overland/OCP rates with attendant absorption practices "constituted no more than routine rate making" (Id. at 668). Thus we held that such rates and practices did not violate Section 15 of the Shipping Act, 1916, or Sections 16 First and 17 of the Act.

The present case was reargued before the present panel of this Court on November 18, 1970, and post-argument briefs were finally submitted on December 3, 1970.

Our intervening decision in *Port of New York Authority*, supra, bears directly upon our present review of the Commission's earlier report and order in Docket No. 872. When this petition for review of the Ports was filed, the relief sought by petitioners was a finding by us that the Commission had erred in not expressly ordering Pacific Westbound Conference to cancel its overland tariff until such time as the conference had filed with and secured Commission approval of its overland rate system. In the meanwhile, however, in *Port of New York Authority*, supra, we expressly approved the Commission's findings that the overland rate practices of the various Pacific Far East Conferences did not require prior Section 15 approval of the Commission, since they were routine ratemaking. One of the resultant effects of our decision in that case, therefore, is that Pacific Westbound Conference's overland tariff did not require Section 15 approval of the Commission,

and its legality per se must now be accepted.

Though urged by the Ports to do so, we are unwilling to inquire further into the legality of PWC's overland rate tariff since that issue has been concluded and set at rest by our decision in *Port of New York Authority*, supra, and by the recent denial of certiorari by the Supreme Court.

However, we are urged by the Ports to consider further contentions made by them: (1) that in any event the two conferences, PWC and FEC, should be required immediately to file their overland agreements with the Commission, and that we should hold that the Commission's cease and desist order that the two conferences cancel their overland agreement did not thereby relieve them of the obligation to file the cancellation agreement and submit it for approval; (2) that Section 15 of the Act should be enforced by enjoining the overland/OCP rates of PWC as "the product and fruit of over ten years of illegal restraint of competition."

As to the first contention, we read the Commission's report and order of July 28, 1965 as requiring only that the two conferences cease and desist from carrying out their supplementary agreements to Agreement No. 8200, including the supplementary agreement relative to overland rates, "until filed with and approved by the Commission." The supplementary agreement between the two conferences provided that they would continue to establish rates for overland territory without any change in previously established differentials and thus maintain the status quo by an automatic adjustment between PWC's overland rates and the local rates of FEC. (See 8 F.M.C. at 564.) There is no express requirement by the Commission that the supplementary agreements, including that providing for overland rates, be filed. If the two conferences desire to operate under any or all of the supplementary agreements they will, of course, be required to file them with the Com-

mission for Section 15 approval. If they cease and desist from carrying out the supplementary agreements nothing further is required under the circumstances.

In their second contention the Ports seek an injunction from us enjoining the use by PWC of its overland tariff as being the product and "fruit" of PWC's past concerted activities with FEC. The Ports contend that the Commission has allowed PWC to continue the use of its overland freight tariff, and that neither conference, PWC or FEC, has been deprived of the enjoyment of the "fruits" of an illegal agreement between them. We are asked, therefore, to enjoin the use by PWC of an overland tariff until specific approval thereof has been received from the Commission, under Section 15—this despite the fact that PWC has had an overland tariff since its beginning as a conference in 1923.

If in fact collaboration between the two conferences on overland rates ceased in 1965, when ordered by the Commission to do so, the overland rates of PWC as they exist now are the result of independent action of PWC and its members within that conference which is lawful under our approval of such overland rates in *Port of New York Authority,* supra. This is especially true when we consider the long history of the use of overland rates by PWC since the Commission originally approved PWC Agreement No. 57. Enjoining the use now of PWC's overland tariff unless specific Section 15 approval by the Commission is secured, would be contrary in principle to our holding in *Port of New York Authority,* supra, and must be denied.

Nor do we agree, as the Ports contend, that affirmance of the Commission's re-

port and order in the instant case, in respect to allowing PWC to continue use of its overland tariff, would be inconsistent with our prior ruling in the *Port of New York Authority,* supra. We have heretofore affirmed the Commission in its holding that establishment of overland rate tariffs by the separate Pacific Coast conferences of ocean carriers did not require prior Section 15 approval, being routine ratemaking fully authorized by the Commission's approval of the conference agreements. In the present case, however, the Commission held that the supplementary agreements to Agreement No. 8200 of PWC and FEC, including the agreement relative to overland ratemaking, were not routine agreements but interconference agreements between two conferences which required Section 15 approval. We see no inconsistency insofar as the Commission rejected the concerted activities of two competitive conferences, one a Pacific Coast, the other an Atlantic Coast Conference, in regard to a supplementary agreement respecting overland rates, for failure to have prior Section 15 approval of the Commission, but accepted without such approval the vastly different practice—historically of long duration—of the several Pacific Coast conferences in establishing and using overland tariffs.[7] We agree with the Commission's finding that overland ratemaking within a single conference was routine whereas concerted collaboration between the two conferences in this regard was not.

Accordingly, the petition for review of the Ports is in all respects denied; the action of the Commission insofar as the present petition for review is concerned is

Affirmed.

---

7. The Commission explained the difference in its holdings in the two cases in Investigation of Overland/OCP Rates & Absorptions, 12 F.M.C. 184, 213 (1969), as follows:

"In Docket 872, the agreement was one between two conferences in different, competitive trades; although they were authorized to meet and agree upon the establishment or change of rates, it was found that such authority did not cover a system of 'concurrences' and 'initiative items' under which one conference in effect surrendered its rights even to initiate consideration of certain rate changes without the prior concurrence of the other. This was hardly within the contemplation of ordinary ratemaking procedure."