Albert THOMAS and Ellora Thomas, his wife, Plaintiffs,

v.

Rogers C. B. MORTON, Secretary of the Interior, et al., Defendants.

No. CIV. 74–139–TUC–WCF.

United States District Court, D. Arizona, Tucson Division.

Jan. 12, 1976.

Hale C. Tognoni, Phoenix, Ariz., for plaintiffs.

William C. Smitherman, U. S. Atty., P. Michael Drake, Asst. U. S. Atty., Tucson, Ariz., Richard J. Riley, Bisbee, Ariz., for defendants.

## ORDER

FREY, District Judge.

The complaint in the present case was brought pursuant to the Administrative Procedure Act to seek judicial review of a final decision of the Department of Interior. (See paragraphs I and II of plaintiffs' complaint).

Defendants-Contestants DeVilbiss are stock raising homestead patentees. On June 15, 1967, they filed a private contest complaint with the Bureau of Land Management alleging that certain mining claims belonging to Plaintiffs-Contestees Thomas, located on DeVilbiss' patented homestead land and Taylor Grazing lease, were null and void for lack of discovery. In a decision dated November 9, 1971, the hearing examiner ruled that the surface owners, DeVilbiss, had standing to bring a private contest challenging the validity of the mining claims and that the subject mining claims were null and void for lack of requisite discovery. On February 28, 1973, the Interior Board of Land Appeals affirmed the decision of the hearing examiner.

Following the decision of February 28, 1973, by the Department of Interior Board of Land Appeals, the plaintiffs, Thomas, filed an action in this Court on April 30, 1973 (CIV 73–90–TUC–WCF). That complaint was labeled "Appeal of Private Contest of Mining Claim From U. S. Dept. of The Interior." Defendants in such action were the same Sam A. and Laura DeVilbiss who are defendants in the instant case.

In the prior case, (CIV 73–90), plaintiffs alleged jurisdiction and venue under the Administrative Procedure Act (5 United States Code, Sections 701–706 and Title 28, United States Code, Sections 1361 and 1391(e)). This prior action clearly sought judicial review of the administrative action involving the same mining claims and the same underlying issues involved in the instant case. The relief sought in such prior action was:

"1. That the court issue an order that the Department of Interior is without jurisdiction to open its forums to mineral contests initiated by a private party who has no adverse mineral claim incompatible with that of the contestee.

"2. That the court issue an order that the Liberty claims are not invalid for lack of discovery.

"3. That the court issue an order invalidating the Box Canyon # 1 through # 6 mining claims described in Exhibit 'B' and located by the defendant Sam DeVilbiss in manifest 'bad faith'.

"4. That the court remand this case to the Secretary of the Interior for prompt administrative recognition of the above orders of this court."

The prior case (CIV 73–90–TUC–WCF) was dismissed on motion of defendants DeVilbiss for failure to join an indispensible party, the Secretary of Interior.

No appeal was taken from the order of dismissal. The "Memorandum and Order" filed and entered on September 14, 1973, in CIV 73–90 is appended hereto as an exhibit. Therein the Court carefully reviewed the legal insufficiency of the complaint and clearly ruled that as between the parties Thomas and DeVilbiss, the ruling of the Department of Interior was res judicata.

Approximately ten months after the entry of the Order in CIV 73–90, plaintiffs filed the instant action (on July 19, 1974). The original complaint herein again was labeled "Appeal of Private Contest of Mining Claims From the Department of The Interior". Again jurisdiction was alleged under "5 U.S.C. Secs. 701–706". The relief sought herein is:

"1. Complainants' Liberty claims are not invalid for lack of discovery.

"2. The Interior Department had no jurisdiction to allow private parties to contest the validity of a mining claim within the peaceful use and possession of a prior claimant.

"3. This case is to be remanded to the Department of Interior for prompt administrative recognition of the above said orders."

As can be noted from the caption, plaintiffs now joined the Secretary of Interior and the Howards as defendants along with the DeVilbiss.

After the answers were filed by the defendants, plaintiffs moved for a preliminary injunction and summary judgment. The preliminary injunction was sought "to prevent Appellees William and Diane Howard from initiating or continuing the erection of any permanent improvement upon the land comprising Appellants' Liberty Lode Claims until such time as a judicial review of the Secretary's decision invalidating said claims is complete."

The defendants filed respective cross motions for summary judgment and the matter came before the Court for hearing. Plaintiffs' motion for temporary restraining order was denied. The motions for summary judgment were taken under submission and plaintiffs were granted twenty days to move for leave to file an amended complaint.

Plaintiffs duly filed such motion. Defendants filed objections to plaintiffs' motion. The matter is before the Court for resolution as to whether plaintiffs should be allowed to file the proposed amended complaint and/or whether summary judgment should be granted to plaintiffs or to one or all of the defendants.

## DISCUSSION

All parties concede or agree that basically plaintiffs in this action and in the preceding action (CIV 73–90) seek judicial review of a final decision of the Department of Interior invalidating plaintiffs' Liberty Lode Claims.

The scope of such judicial review is limited. This Court must determine if the administrative findings of fact are supported by substantial evidence on the record as a whole and whether the Secretary applied the proper legal standards or principles to the facts. *Henrikson v. Udall,* 350 F.2d 949, 950 (C.A. 9, 1965); *Mosely v. Hickel,* 442 F.2d 1030 (C.A. 9, 1971); *Sanford v. United States,* 399 F.2d 693, 694 (C.A. 9, 1968).

Thus, it is clear that before plaintiffs can be granted any relief, whether under the original complaint herein or the proposed amended complaint, this Court must determine that the Secretary's factual findings are not supported by substantial evidence and/or that the Secretary applied improper legal standards to the facts in reaching his conclusions.

However, throughout this case and the previous one (CIV 73–90) plaintiffs have sought to inject extraneous issues and have burdened the Court with examining much legal authority because of the great amount of argument made and authority cited with regard to such extraneous issues.

Throughout the course of this case, plaintiffs urged the Court to reverse the final decision of the Department of Interior because the defendants DeVilbiss did not have standing to bring a private contest challenging the validity of the Liberty Lode mining claims. In addition, plaintiffs urged this Court to make a determination as to who had the right of possession in the mining claims and the land whereon same were located.

Plaintiffs alleged that defendants Howard were unlawfully asserting an exclusive right to all minerals contained upon the lands comprising the Liberty Lode claims. Thus, plaintiffs sought a preliminary injunction to prevent defendants from placing any permanent improvements upon the lands comprising the claims under review.

The Court denied the Motion for Preliminary Injunction as not being properly before the Court under the pleadings. Further, there were not sufficient grounds for the issuance of such injunction.

Plaintiffs' original complaint seeks judicial review of an administrative decision and invokes the jurisdiction of this Court under the Administrative Procedure Act, Title 5, United States Code, Sections 701–706.

The Court pointed out to counsel for plaintiffs that he was trying to combine two causes of action and that the only

issue properly before the Court was an appeal from the IBLA. In order for plaintiffs to seek a preliminary injunction counsel was advised that he would have to institute a new action or file a Motion for Leave to Amend the Complaint to add a separate Count. The Court summarized its position by stating:

"The Court's jurisdiction with respect to an appeal of this nature is limited and that you appear to be raising issues extraneous to this appeal but perhaps properly raised in this Court in either a separate count or separate action."

Thus, the Motions for Summary Judgment were taken under advisement, the Motion for Preliminary Injunction was denied, and plaintiffs were given twenty (20) days from the date of the hearing in which to file a Motion for Leave to Amend the Complaint or to address any other issues. Defendants had twenty (20) days in which to respond to plaintiffs' motion.

On February 3, 1975, plaintiffs filed a Motion for Leave to Amend the Complaint, supported by a memorandum of points and authorities. In addition, plaintiffs filed an affidavit of plaintiff Albert Thomas and an appendix. It appears that plaintiffs' proposed amended complaint is even more prolix and confusing than the first complaint and adds nothing except additional extraneous matter.

 Defendant Morton opposes the motion to amend the complaint to seek an injunction because even if the amendment were allowed, the Court lacks jurisdiction to issue an injunction or award damages. The complaint and jurisdiction arises under the Administrative Procedure Act. Plaintiffs seek to inject other issues into the action over which the Court lacks subject matter jurisdiction. Plaintiffs want the Court to interfere in a dispute over possessory interests. Further, defendant Morton contends that the proposed amended complaint does not allege facts showing plaintiffs to be entitled to an injunction. There is no allegation of irreparable injury nor an allegation that remedies at law are inadequate. These contentions of defendant Morton are all well taken.

 Defendants DeVilbiss and Howard have filed an opposition to plaintiffs' Motion to Amend the Complaint and a Motion to Strike the affidavit of plaintiff Albert Thomas dated January 30, 1975. These defendants contend that this lawsuit involves only an appeal from an administrative decision of the Department of Interior. This is correct. The plaintiffs, by their amended complaint, wish to expand this action to embrace matters which are irrelevant to this appeal and over which this Court has no jurisdiction. In addition, these defendants contend that the matter contained in the plaintiff's affidavit is immaterial, irrelevant, scurrilous and hearsay. There is no justification in the rules of procedure for the filing of such an affidavit and it should be stricken from the record. These contentions are all well taken and the motion is granted.

Also, the motion of plaintiffs for leave to file an amended complaint should be and is denied. Therefore, the Court will not consider the issues raised by the respective motions for summary judgment.

## BACKGROUND

A brief history of the land and claims in question is, as follows:

*January 1, 1920—LOCATION OF LIBERTY NO. 1* in Section 22 by C. N. Thomas and Byron G. Thomas (uncle of contestee). Contestee's Exhibit # 3.

*December 7, 1922—STOCK RAISING HOMESTEAD* Patent No. 889712 in Section 22 to C. N. Thomas:

" . . . reserving . . . to the United States all the coal and other minerals in the lands so entered for patented together with the right to prospect for, mine, and remove the same pursuant to the provisions and limitations of the act of December 29, 1916. (39 Stat. 862)" Contestee's Exhibit # 1

*March 25, 1926—QUITCLAIM DEED* from the apparent heirs of C. N. Thomas transferring parts of Section 21, T. 22 S., R. 23 E. to Edward Thomas, along with a right of way across Section 22, Stock Raising Homestead No. 889712, and the Liberty No. 1 mining claim as set forth in Contestee's Exhibit # 88:

"together with a right of way extending from the N–½, N.E.–¼ Sec. 21, T. 22 S., R. 23 E. G. & S. R. B. & M., Arizona, not to exceed fifteen (15) feet in width, and to extend from the East line of said Section 20, to the East line of said Section 22."

*June 20, 1934—LOCATION OF LIBERTY AND LIBERTY NO. 2 THROUGH 5* by Edward Thomas (Contestee's Exhibits Nos. 2 and 4 through 7).

*1952*—Sale of Stock-raising Homestead No. 889712 to Houston Davis' father (Tr. 20).

*July 10, 1956*—Estate of Edward Thomas transfers all right and title to all property owned by Edward Thomas, including the Liberty and Liberty Nos. 1–5 mining claims and the right of way established in 1926 quitclaim deed to Albert Thomas, contestee. (Contestee's Exhibit No. 9).

*July 1, 1964*—Sale by Houston Davis of Stock-Raising Homestead No. 889712 to Sam DeVilbiss. (Contestants' Exhibit A).

*July 30, 1964*—Lease from Department of Interior to Sam DeVilbiss for grazing livestock. (Contestants' Exhibit B).

*June 15, 1967*—Defendants, Sam A. DeVilbiss and Laura DeVilbiss, his wife, filed a Complaint in the Arizona Land Office, Bureau of Land Management alleging that they were the owners of the surface estate of certain real property in Cochise County and that they had a Taylor grazing lease on other real property in Cochise County in Arizona and that the Thomas' had claimed rights to the Liberty and Liberty Numbers 1 through 5 lode mining claims on their property. The DeVilbisses maintained that there was no valid discovery, as defined by the mining laws of the United States, that the land was non-mineral in nature, as defined by the mining laws of the United States, and that the Thomases had no valid title or claim or assessment work to support their alleged mining operations and that the Thomases had destroyed surface improvements which belonged [to] the DeVilbisses. (Record, Contest No. 1069, United States Department of the Interior, Bureau of Land Management, Land Office, Phoenix, Arizona).

*November 5, 6 and 9, 1970*—A hearing on the contest was held in Bisbee, Arizona and in a decision dated November 9, 1971, Hearing Examiner John R. Rampton, Jr., held that the surface owners, DeVilbisses, had standing to bring a private contest challenging the validity of the mining claims and that the subject mining claims were null and void for lack of the requisite discovery. *DeVilbiss v. Thomas,* 10 IBLA 59 (Nov. 9, 1971).

*February 28, 1973*—The Interior Board of Land Appeals, pursuant to authority delegated to it by the Secretary of the Interior, 43 C.F.R. 4.1, affirmed the decision of the Hearing Examiner. *Thomas v. DeVilbiss,* 10 IBLA 56 (Feb. 28, 1973).

## ISSUES PRESENTED

1. Did defendants DeVilbisses have standing to initiate a private contest concerning plaintiffs' Liberty Lode Claims.

2. Was there substantial evidence to support the Secretary's decision invalidating plaintiffs' Liberty Lode Claims.

There are other collateral issues raised by plaintiffs and defendants DeVilbiss and Howard, such as estoppel, right to possession, res judicata, injunctive relief and laches. These issues appear to have no place in this action and this Court's disposition of the two real issues makes it unnecessary even to consider such collateral issues.

## JURISDICTION

Jurisdiction in this case is governed by the Administrative Procedure Act, Title 5, United States Code, Sections 701–706.

The standard for judicial review is very limited, as previously stated. This Court must determine only if the Secretary's decision is arbitrary or capricious or unsupportable by substantial evidence, considering the *record* as a whole. *Sanford v. United States,* 399 F.2d 693, 694 (9th Cir. 1968); *Multiple Use Inc. v. Rogers C. B. Morton,* 504 F.2d 448 (9th Cir. 1974).

The Courts may not substitute their judgment for that of the administrative agency's expertise in the field. *Port of New York Authority v. Federal Maritime Commission,* 429 F.2d 663, 666 (5th Cir. 1970), *cert. denied,* 401 U.S. 909, 27 L.Ed. 806 (1971). See also *Ickes v. Underwood,* 78 U.S.App.D.C. 396, 141 F.2d 546 (1944), *cert. denied,* 323 U.S. 713, 65 S.Ct. 39, 89 L.Ed. 574 (1944); *Halsey v. Nitze,* 390 F.2d 142, 144 (4th Cir. 1968), *cert. denied,* 392 U.S. 939, 88 S.Ct. 2316, 20 L.Ed.2d 1399 (1968).

Culling out all of plaintiffs' extraneous matter, their whole case is based on their conclusion (1) that Sam and Laura DeVilbiss were improperly granted standing before the Department of Interior for the purpose of contesting the validity of plaintiffs' mining claims (Liberty and Liberty Nos. 1 through 5); and (2) that the Secretary's decision of February 28, 1973, upholding the decision of the Administrative Law Judge, John R. Rampton, is not supported by substantial evidence appearing from the whole record and is therefor insufficient as a matter of law to find their (plaintiffs') mining claims null and void for lack of discovery. (Paragraphs II and III of plaintiffs' complaint). See also plaintiffs' summation contained in "Contestees' Statement of Reasons for Appeal before the Board of Land Appeals, Arizona 1069." See also Paragraphs IX and X of plaintiffs' proposed Amended Complaint.

If these issues are decided adverse to plaintiffs all the other issues raised herein by plaintiffs and defendants need not be considered.

## THE STANDING ISSUE

The governing principle of law is 43 C.F.R. 4.450 (formerly 1852.1–1) which reads:

"Any person who claims title to or an interest in land adverse to any other person claiming title to or an adverse interest in such land . . . may initiate proceedings to have the claim of title or interest adverse to his claim invalidated for any reason not shown by the records of the Bureau of Land Management. Such a proceeding will constitute a private contest and will be governed by the regulations herein."

Plaintiffs claim this regulation is in derogation of Title 43, United States Code, Section 299 because said statute provides that patents issued under the Stock Raising Homestead Act are subject to or subservient to mineral claims and claimants and that such statute does not authorize any private party to contest the validity of the mineral entry made upon lands wherein mineral rights are reserved; that a patentee such as defendants DeVilbiss and Howard has only a claim for damages if there is any conflict of interest or adverse interest to be resolved.

The argument is without merit. Clearly the provisions of Title 43, United States Code, Section 299 were not intended to provide a patentee an exclusive remedy, nor does 43 C.F.R., Section 4.450–1 conflict in any way with the rights and remedies set forth in said Section 299.

Plaintiffs' counsel expends much time and effort exploring the legal authorities relating to cases wherein the issue was one of conflicting rights and claimed damages by surface owners against those engaged in mining activities, e. g., *Kinney—Coastal Oil Co. v. Kiefer,* 277 U.S. 488, 48 S.Ct. 580, 72 L.Ed. 961; *Best v. Humboldt Mining Co.,* 371 U.S. 334, 83 S.Ct. 379, 9 L.Ed.2d 350.

In *Duguid v. Best,* 291 F.2d 235 (9th Cir. 1961), *cert. denied,* 372 U.S. 906, 83 S.Ct. 713, 9 L.Ed.2d 716 (1963), the Ninth

Circuit Court of Appeals construed 43 C.F.R. 221.51, the forerunner to the regulation involved here and substantially identical to it. *Duguid* held that the holder of a special use permit granted by the Forest Service, Department of Agriculture, to construct a dam and spillway on National Forest land could initiate a private contest to determine the validity of mining claims on land covered by the special use permit. In other words, the holder of a surface interest had standing to contest mining claims on the same property. Although *Duguid* did not consider the precise question of whether a stock-raising homestead claimant, such as DeVilbiss, has standing to initiate a contest, the reasoning in *Duguid* applies nationally to the instant case. If a permittee has standing, then a fortiori a patentee has standing.

The Department of Interior, Board of Land Appeals, has recently dealt with the specific question involved here, i. e., whether a stock-raising homestead patentee may initiate a contest against mining claims pursuant to 43 C.F.R., 4.450–1. *Sedgwick v. Callahan,* 9 IBLA (January 31, 1973). At page 222, the Board stated:

"The most compelling argument in support of the position that the surface owner under the Act has standing to bring a contest against a mining claimant can be made from the language of the Act itself. As set forth above, the Act makes a distinction between the mineral prospector and the claimant who has actually made a discovery of minerals. With respect to the mere prospector, the surface owner is stated to have the right to compensation for damages to the surface resources caused by prospecting activities. On the other hand, the claimant who has actually acquired title to a mineral deposit from the United States, either by patent or a showing that he has perfected a discovery of a valuable mineral deposit as contemplated by the general mining laws, *Mohamed, supra,* may reenter and conduct mining activities only upon:

"1. Securing the written consent of the surface owner; or

"2. Agreement as to the amount of damages to the surface; or

"3. Execution of a sufficient bond for the benefit of the surface owner to secure payment of such damages.

"Since the Department of the Interior is the proper tribunal to determine whether a valid discovery has been perfected in an unpatented mining claim, *Best v. Humboldt Placer Mining Co.,* 371 U.S. 334 [83 S.Ct. 379, 9 L.Ed.2d 350] (1963), the surface owner is entitled to bring an action in the Department for that purpose, so that he may know the proper course to follow in protecting his surface estate. *Branch v. Brittan, et al.,* 50 L.D. 510 (1924).

"Accordingly, it is concluded that the Contestants have standing to bring these contests to determine whether valid discoveries have been perfected on the mining claims."

■ Clearly, therefore, the contestants (defendants DeVilbiss) had standing to bring this private contest and the Department of the Interior had authority to adjudicate it.

■ Plaintiff argues that he has an interest in the surface in the nature of a right of way created by adverse possession, and that since he has such an interest, his use of the surface is not adverse within the meaning of 43 C.F.R. § 4.450–1. It is his assertion of an interest in the mining claims, however, and not his interest in any easement, which creates the adverse use which gives the Interior Department authority to hear a private contest such as this. See *Duguid v. Best, supra.* 43 C.F.R., Section 4.450–1 does not prohibit a surface interest from existing simultaneously with valid mining claims, as plaintiffs seem to read it. Under the mining laws the two clearly can co-exist. The regulation simply provides a means for a surface owner to challenge the validity of the mining claims, that is, to ask the Department of

the Interior to rule on whether a valid mineral discovery has been made. The regulation does not authorize divestment of an interest in valid mining claims.

Plaintiff argues that the Interior Department failed to make a finding of fact whether plaintiff's use of the surface was or was not reasonably incident to his mining activity. Whether such use was reasonably incident to mining activity, however, is irrelevant if a determination is made, as here, that there has been no discovery.

■ Plaintiff argues that an action for damages is the only remedy contemplated by the mining laws which is available to a surface owner and that 43 C.F.R., Section 4.450–1 unlawfully creates another remedy. This misconstrues the nature and purpose of the private contests authorized by the regulation. This regulation does not create another remedy available to surface owners in the nature of ejectment. It simply allows surface owners to bring invalid claims to the attention of the Interior Department for a determination of validity. This is something the Interior Department can do on its own initiative in government contests.

*Transwestern Pipeline Co. v. Kerr-McGee Corp.,* 492 F.2d 878 (10th Cir. 1974), relied upon by plaintiff, is not applicable to the instant case. It did not deal with a contest before the Department of the Interior. It involved a dispute between private parties over lateral and subjacent support of surface improvements. Much of plaintiffs' argument in support of their motion is irrelevant. They argue that defendants DeVilbisses have located claims on the land involved here and are therefore estopped to deny the validity of plaintiffs' claims. Any action taken by the parties subsequent to the decision by the IBLA (February 28, 1973) is irrelevant, since the only question properly before the Court is the correctness of that decision. In turn, this Court's determination must be made on the basis of the administrative record filed in this action. Even if defendants **DeVilbisses have located their**

own claims, the validity of those claims is not a question properly before this Court.

The factual basis for the determination of adverse interest sufficient to warrant standing is clearly found in the record.

The undisputed facts set out in the beginning of this Order show that defendants DeVilbisses were the owners of the surface rights (patentees) of the land whereon all or part of each of the disputed Liberty Claims is located.

■ At the outset of the hearing, the Hearing Examiner or Administrative Law Judge, Rampton, stated:

"I will say this, that my present thinking is, and this is subject to change if the parties can show differently, is that some adverse interest has to be established. If the contestants' rights have not been infringed upon in any way, then, in my opinion, there is no basis for a contest. And I will just base that upon the statement in regulation 43 C.F.R. 1852.1–1 . . . ."

Tr. Pages 13–14.

He was correct.

■ It appears to the Court from a review of the Decision of the Hearing Examiner as affirmed by the Interior Board of Appeals, that as a matter of law, the interests of a surface owner (as patentee), as well as the interests of a holder of a Taylor grazing permit are per se sufficiently adverse to the interest of a mining claimant so as to have standing to initiate proceedings to invalidate a mining claim. See *Sedgwick v. Callahan,* 9 IBLA 216 (January 1973).

This appears to be a sound, logical and common sense determination. It is obvious from a mere examination and understanding of the respective interests, that they are conflicting. Certainly a surface owner or even permittee of surface rights cannot fully use and enjoy those surface rights when constantly threatened with loss of use of all or even a small portion thereof. True, a surface owner or permittee may be entitled to receive compensation for damages, but

many times this is small or inadequate to replace the loss of use of unique surface rights; unique, is used because each piece of the surface of this Country is unique in some respect. There may be similar land or comparable land, but it is necessarily located elsewhere.

Further, adopting the reasoning or conclusion in *Duguid, supra,* if the purpose and end result of a private contest operates to protect the Government against invalid claims of title to or interest in public lands, then it is only reasonable that the public interest is served by allowing anyone with sufficient nexus, i. e., a possible conflicting or adverse interest such as surface owner or permittee to bring to the attention of the Government, through a private contest, the possibility of an invalid claim of title or interest in public land. The general public, not the prospector or mining claimant has the paramount interest to be considered in preserving and protecting public lands or public interest in lands from being subjected to invalid or unwarranted claim or encroachment. If the Government through the Bureau of Land Management or other Federal Bureau or Agency can institute a proceeding, such as involved here, to invalidate mining claims, then certainly a private party with *any interest* in land *which might reasonably be affected* by the mining claim or any activity incident thereto or stemming therefrom, *should have standing* to institute a private contest to put the Government on notice and to resolve the issue of the claimed invalidity of a mining claim.

As was clearly evident from the record in this case, mining claims abound throughout this area. Witness Reed testified he has examined several thousand (Tr. pg. 340). He has talked to prospectors, people who locate mining claims, "in the hundreds". (Tr. pg. 340). Witness Henry Smith, Jr., testified he was familiar with a hundred or so claims other than his own (Tr. pgs. 486–488). Witness Wayne Winters testified he has had contact with and known "easily a thousand" people who have located mining claims. (Tr. pg. 508).

From just this small representative portion of the community or class of mining claimants and those associated with same, it is obvious that mining claims and claimants are in over-abundance. Their activities such as shown here, by their very nature, necessarily affect and conflict with rights and interests of surface owners and permittees.

■ If specific factual basis for adverse or conflicting interests between the Contestants (Defendants DeVilbiss) and Contestees (Plaintiffs Thomas) is necessary, other than the general adverse or conflicting interests discussed above, such is apparent from the record.

The surface owners, DeVilbiss and now Howard, graze cattle on their patented land and the Taylor Grazing land involved. Cattle in this southwest need feed, water and shade. This Court can take judicial notice of this and of the nature of the area wherein all the subject land is located. Plaintiffs-Contestees Thomas cut down trees (Tr. pgs. 162–184, 187), he blocked cattle from water (Tr. pgs. 218, 260, 319, 450), he put up and tore down gates and fences (Tr. pgs. 193, 532), he left gates open (Tr. pgs. 71–73), he put up barriers (Tr. pgs. 110, 193, 530–532), he interfered with the water pump supplying cattle with water (Tr. pg. 542).

In addition there were mining monuments scattered over the land in question in a manner constituting a nuisance, at least (Tr. pgs. 182, 224, 229, 316, 540).

Further, there were holes, diggings, dangerous shafts, tunnels, excavations over the area of the claims, all of such by their very nature are unsightly scars upon the surface. To add to this, there was apparently other unsightly objects around one of the claims (Tr. pg. 176). There is the additional matter of the blasting incidental to the working of these claims; in one year 30–40 times. (Tr. pgs. 152–153). Blasting is inherently dangerous to persons, animals and adjacent property.

Added to all this, was the constant claim of plaintiffs Thomas of a right of way, easement or access to and from his

mining claims as shown throughout the testimony of Mr. Thomas and Mr. and Mrs. DeVilbiss. Witness Pintek aptly stated it when on cross examination by counsel of plaintiff Thomas he responded: "He claims that his roadway runs anywhere he wants it to go." (Tr. pg. 582, lines 23–24).

Clearly, the finding and conclusion of the Hearing Examiner and adopted by the Interior Board of Appeals (Secretary, that Contestants-Defendants, DeVilbiss, have standing to initiate the private contest involved here, is well supported in fact and is a proper conclusion of law.

### THE DISCOVERY ISSUE

Defendants DeVilbiss, Contestants in the private contest involved, initiated the contest by contending, inter alia, that none of Contestees-Plaintiffs' (Thomas) Liberty Claims had a valid discovery as defined by the mining laws of the United States. There were other issues raised in the contest complaint such as the non-mineral nature of the land and invalid title to the claims in question. However, the administrative decision was based on the issue of lack of discovery of valuable minerals in place on the contested claims.

The locator of a mining claim obtains no rights against the United States until there has been a discovery of a valuable mineral deposit within the limits of the claim. Title 30, United States Code, Section 23. *Best v. Humboldt Placer Mining Co.,* 371 U.S. 334, 83 S.Ct. 379, 9 L.Ed.2d 350 (1963); *Cameron v. United States,* 252 U.S. 450, 40 S.Ct. 410, 64 L.Ed. 659 (1920); *Cole v. Ralph,* 252 U.S. 286, 296, 40 S.Ct. 321, 64 L.Ed. 567 (1920). Implementation of this standard has been left to the Executive and to the Courts. *Converse v. Udall,* 399 F.2d 616, 619 (9th Cir. 1968).

In 1905, the Supreme Court in *Chrisman v. Miller,* 197 U.S. 313, 322, 25 S.Ct. 468, 470, 49 L.Ed. 770, approved and adopted the "prudent man" test developed or adopted by the Department of Interior in *Castle v. Wamble,* 19 L.D. 455, 457 (1894).

"Where minerals have been found, and the evidence is of such a character that a person of ordinary prudence would be justified in the further expenditure of his labor and means, with a reasonable prospect of success, in developing a valuable mine, the requirements of the statute have been met."

This test has been repeatedly approved both by the Supreme Court and this Circuit. See *Cole v. Ralph, supra; Best v. Humboldt, supra; United States v. Coleman,* 390 U.S. 599, 602, 88 S.Ct. 1327, 20 L.Ed.2d 170 (1968); *Lange v. Robinson,* 148 F. 799 (9th Cir. 1906); *Charlton v. Kelly,* 156 F. 433, 436 (9th Cir. 1907); *Adams v. United States,* 318 F.2d 861, 870 (9th Cir. 1963); *Multiple Use Inc., v. Rogers C. B. Morton, etc., supra.*

This Court adopts the language of Hearing Examiner Rampton which was also approved and adopted by the Interior Board of Land Appeals (10 IBLA 56, 63):

"With respect to lode mining claims, it has been held that there must be physically exposed within the limits of the claim the vein or lode-bearing mineral of such quality and of such quantity as to justify the expenditure of money for the development of a mine and the extraction of the mineral. *Waskey v. Hammer,* 223 U.S. 85 [32 S.Ct. 187, 56 L.Ed. 359] (1912). It has also been held that it is not enough that the mineralization found might justify further prospecting or exploration to determine whether actual mining operations would be warranted. *United States v. Ford M. Converse,* 72 I.[L.]D. 141 (1965), *affirmed* in *Converse v. Udall,* 399 F.2d 616 (9th Cir. 1968), *cert. denied* 383 [393] U.S. 1025 [89 S.Ct. 635, 21 L.Ed.2d 569] (1969); *United States v. Henault Mining Company,* 73 I.[L.]D. 184 (1966), *affirmed* in *Henault Mining Company v. Tysk,* 419 F.2d 766 (9th Cir. 1969), *cert. denied* 398 U.S. 950 [90 S.Ct. 1869, 26 L.Ed.2d 290] (1970).

"The finding of mineralization alone is insufficient to constitute a discovery of mineral sufficient to validate a min-

ing claim. In the case of *Chrisman v. Miller, supra,* oil had been found seeping at the surface within the limits of an oil placer mining claim. With respect to mineralization, the Court stated: 'It does not establish a discovery. It only suggests a possibility of mineral of sufficient amount and value to justify further exploration.' (p. 320). And further, '. . . the mere indication of presence of gold or silver is not sufficient to establish the existence of a lode. The mineral must exist in such quantities as to justify expenditure of money for the development of the mine in the extraction of the mineral.' (p. 322).

"In the more recent case of *United States v. Coleman, supra,* the Supreme Court stated: 'The Secretary of the Interior held that to qualify as "valuable mineral deposits" under 30 U.S.C., Sec. 22 it must be shown that the mineral can be "extracted, removed and marketed at a profit"‧ the so-called "marketability test".' " (p. 600).

See also the discussion concerning discovery contained in *Multiple Use Inc., v. Morton, supra.*

### EVIDENCE

Counsel for Contestants-Plaintiffs does not seem to dispute the credibility of the evidence supporting the Secretary's decision, he merely disagrees with it.

From reading the record herein, the most credible, qualified and informative witness with respect to the crucial issue of discovery was Mr. John L. Splane, a registered professional mining engineer and professional consultant with 22 years of experience (at time of hearing) in mining, mining operations, exploration and feasibility studies. He made examinations for clients in this Country and all over the world, advising such clients as to the merits of mining properties, making mineral examinations. (Tr. pgs. 227 and 242). He carefully examined the mining claims in question in September, 1963, and again in October, 1970 (Tr. pgs. 228 and 234). He took representa-

tive samples of ore from each of the claims and had such samples assayed. The best gross mineral value, shown as the result of the assay of such samples, was less than 75 cents per ton. The cost to mine such claims was estimated by Splane to be about $15 per ton (Tr. pg. 239) and by Contestees-Plaintiffs' witness to be from $15 to $20 per ton (Tr. pgs. 329, 505, 523). In addition to the mining costs, Splane estimated milling costs to be from $1.50 to $2 per ton (Tr. pg. 239).

The crucial testimony of Mr. Splane as to the "prudent man" test is as follows:

"HEARING EXAMINER RAMPTON: The question that Mr. Tognoni objected to, which I overruled, was whether or not you would advise your client to invest in these claims, and which I feel is helpful for anyone who may wish to invest in, or may wish to seek to develop a mine, which I think would be helpful in anyone determining whether a man would be prudent. So I would ask you to answer that.

"MR. RILEY: I apologize.

"HEARING EXAMINER RAMPTON: Would you advise your clients to invest in these, Mr. Splane?

"A That is the question?

"HEARING EXAMINER RAMPTON: Yes.

"A I certainly would not.

"BY MR. RILEY:

"Q Why not?

"A Well, I just don't think he would have a very good chance. There is a lot of other places that have got a whale of a lot better—

"Q Why don't you think he would have a very good chance?

"A Well, one reason is, from the assays, from the most favorable spots that could have a fair value.

"Q Well, could you be more specific.

"A I wouldn't recommend this property to a client of mine for further expenditure.

"Q Why not?

"A Because I don't think it warrants it.

"Q Why not?

"A Because of the geological appearances, the work that has been done attempting to find ore on the claims has not proven up anything. Evidently the old timers did, you know, did considerable work there looking for ore, and it is apparent that there hasn't been practically no extraction, mining, and everything that I sampled certainly didn't look good.

"Q Well, could you tell us what the cost of extracting the ore would be in relation to the value of the ore?

"A Well, a small mine today, your mining costs are going to be around $15 a ton.

"HEARING EXAMINER RAMPTON: Does that include the cost of smelting?

"A No. That is just the extraction, just bringing it out of the mine. And what I am referring to is underground mining."

(Tr. pgs. 244–245)

The expert testimony offered by the Contestees-Plaintiffs (Thomas) was by Mr. Donald F. Reed, a registered professional civil and mining engineer for 42 years, now a consulting mining engineer (Tr. pgs. 338–340). He had many years of experience examining mines much of it as a government employee with the Bureau of Land Management.

However, he never took any *representative* samples from any of the claims. He generally took "grab samples" which consisted of picking up mineralized rocks from dumps around the various claims. However, he did take some samples from veins of mineral in some of the claims. He took 14 samples in all. (Tr. pgs. 345–358). The value of these *selective samples,* as determined by assay ranged from a low of .84 cents per ton to a high of $48.51. Yet, only three of such selective samples had a gross mineral value of more than $15 per ton, which is the lowest estimated cost of mining these claims. Mr. Reed considered these claims as valid claims. However, when asked the question "whether or not a prudent man would spend time and money with the reasonable expectation of developing a paying mine," he responded "Oh, I would think there is definitely enough value shown there to justify a man who is in the business to spend time and money and effort *in further exploration,* yes." (Emphasis Supplied, Tr. pgs. 350–351). This was with respect to the Liberty Claim. With respect to the other Liberty claims, his response to the same question was "I definitely do. That sample across the 30 inch vein there that ran $26.78 would indicate a possibility of finding very valuable ore body in there." This same question was posed to the witness at one time or another with respect to Liberty Nos. 2, 3, 4 and 5 claims and his responses were substantially the same. With respect to Liberty Claim No. 3, the following is the transcript (Tr. pg. 358):

"Q Now, let's see, we have covered—

"A All but No. 3.

"Q —all but No. 3.

"A And we have only one sample taken from No. 3, which was a long drift with the crosscut and a couple of subsidiary drifts off of it. This sample was taken as a grab from the dump also, and it ran $18.37 per ton. And that was all of the sampling that was done. Fourteen samples were taken.

"Q Based upon your knowledge of the Liberty No. 3, do you have an opinion as to its validity, as to whether a prudent man would—

"A Definitely, it would be considered a valid claim.

"Q Have, you then, covered all of the six claims?

"A All of the six claims."

On cross examination the transcript is revealing as to the questionable validity of the opinion of witness Reed based on the selective nature of some of the samples he took which gave high assay values:

"Q And was this a representative sample of what was in the dump?

"A No, I wouldn't say that.

"Q What was it, then, sir? Was it the best looking rock there?

"A Well, it was what I considered might possibly be ore."

Tr. pg. 368 referring to a second sample:

"Q. $3.96. And this, I believe you said was not a representative sample, either?

"A. No.

"Q This was the best looking rock you could find there?

"A That's right."

With respect to this witness' overall opinion, the transcript, pages 369–370, shows the following:

"Q But did you not consider each one of these claims by itself on direct examination?

"A I considered each one of these claims to be valid because of its relationship and proximity to the other claims. This is in a highly-mineralized area, you are right between Tombstone and Bisbee here. Anything is possible.

"Q Anything is possible? Did this feeling that anything is possible influence your opinion?

"A Well, where you find definite indications of mineral, and in some of these cases very, very definitely good values, you are justified in pursuing even the lesser values in the hope of finding better ones.

"Q Well, let's get back to my question, now. My question was: Did you not base your opinion on the Liberty claim, that it was commercially feasible to develop it—

"A No, I didn't say that.

"Q Well, what did you say about the Liberty?

"A I said it was a valid claim, it was a valid mineral discovery. I did not say it was commercial, commercially feasible to develop.

"Q Well, is it commercially feasible to develop?

"A Not on those values, no."

With respect to a sample from Liberty No. 1 claim, the transcript, pages 374–375, shows:

"Q Now, this wasn't a representative sample either, was it?

"A Yes, it was, this was representative of that 30 inches width of vein.

"Q Of vein?

"A Yes.

"Q Now—

"A Because that chip sample was carefully taken.

"Q Now, how far away from this was the No. 2 sample?

"A Approximately 300 feet, I would say.

"Q And this came out to $1.97 total value?

"A That's right.

"Q It would cost you a lot more than this to mine that, wouldn't it?

"A Yes, surely.

"Q And No. 3 on Liberty 1 proved out to be 84 cents in value, is that correct?"

With respect to a sample from Liberty No. 2 claim, transcript pages 375–376:

"Q Now on Liberty No. 2, you took four samples right?

"A Right.

"Q And one from a 12-inch vein, is that correct?

"A Yes. That was in the road cut, that wasn't the main vein. This was across from the—

"Q This was a 12-inch vein?

"A It was 12 inches wide where I sampled it.

"Q And all you took was ore from a vein?

"A Certainly. You don't sample waste rock.

"Q And this proved out $5.58?

"A Yes."

With respect to the samples relied on by this witness, the following appears on page 378 of the transcript:

"Q Oh, I don't know. Now, you didn't take a representative sample from this dump either, did you?

"A No.

"Q You took the best you could find?

"A I didn't take any representative samples from any of the dumps.

"Q You took the best stuff you could find?

"A I took what looked like might possibly be ore, yes. I was trying to find if there was any ore values there, not what the dump would run."

The highest mineral value obtained from Contestees-Plaintiffs samples was $48.51 which allegedly came from Liberty No. 5 claim. The testimony on cross examination proved interesting, transcript pages 392–393:

"Q Now, on your map here, this Contestees' Exhibit 8, you show that it was a survey by personnel of Mineral Services Corporation.

"A Yes.

"Q Under supervision of Donald F. Reed.

"A These boys have a company which they call the Mineral Services Corporation. They have done quite a bit of this work.

"Q David Tognoni and Robert Williams?

"A Yes.

"Q Are you connected with Mineral Services Corporation?

"A No, I have no connection with them.

"Q Now, did you take these samples?

"A Yes.

"Q That you have testified to?

"A Yes.

"Q And did you take the sample from what you show as Liberty No. 5?

"A No, actually I did not take the two samples from No. 5. David Tognoni took those for me under my direction.

"Q Where were you?

"A Well, I was down on Liberty No. 1.

"Q What you show as Liberty No. 5 is up on top of a mesa, is it not?

"A It is on the top of a ridge, yes.

"Q It is very steep, is it not—

"A It is very, very steep.

"Q —to get up there?

"A Yes.

"Q You can see that from the topo lines on the map, can't you. So you didn't go up there for the sampling of—

"A Of Liberty No. 5, no, I was not.

"Q Did you ever get up there?

"A No, I did not.

"Q Do you know what is up there?

"A Well, you can see a great deal from down below. It lies on a slope there, and you can see the monuments, I could spot the monuments at this No. 2 working here. These contour lines are not accurate in relation to these claims, as you pointed out here Friday. This map, as I understand it, was taken from a map used by the Phelps Dodge people."

■ It appears from a reading of the testimony of witness Reed as a whole, that he made rather selective samplings and based on the results of such selective, non-representative samplings he felt these were valid claims because a prudent man in the prospecting or mine claiming business to look further for valuable mineral deposit or to expend time, money and effort in exploration. This is an improper test for determining a valid discovery or valid claim.

As stated above, it is not enough that the mineralization found might justify further prospecting or exploration to determine whether actual mining operations would be warranted. *United States v. Ford M. Converse,* 72 I.D. 141 (1965), *affirmed* in *Converse v. Udall,* 399 F.2d 616 (9th Cir. 1968), *cert. denied,* 393 U.S. 1025, 89 S.Ct. 635, 21 L.Ed.2d 569 (1969); *United States v. Henault Mining Company,* 73 I.D. 184 (1966), *affirmed* in *Henault Mining Company v. Tysk,* 419 F.2d 766 (9th Cir. 1969), *cert. denied,* 398 U.S. 950, 90 S.Ct. 1869, 26 L.Ed.2d 290 (1970).

There was no credible evidence in this record to show that mineral can be extracted, removed from these claims and

marketed at a profit. *United States v. Coleman, supra.*

In this connection (marketability test) it is interesting to note that these claims have been in existence in relatively their same state from before 1913 without any commercial mining venture having been involved. (Tr. pgs. 222–225), (See also Tr. pgs. 210–217). However, Contestee-Plaintiff Thomas testified his father and brother shipped out some ore and got $30,000 (Tr. pg. 272). Nothing in the record supports this bare assertion.

One further note with respect to the validity of these claims and the marketability test involves the testimony of a witness called by Contestees-Plaintiffs to show the validity of the claims in question. He testified on cross examination: "I didn't say it could be developed at a profit". (Tr. pg. 523).

Contestees-Plaintiffs called other witnesses in support of their position that there was a valid discovery of valuable mineral sufficient to meet the "prudent man" and "marketability" tests. However, from a review of their testimony, it is readily apparent to this Court that their testimony was given little or no weight because of lack of qualification or lack of proper foundation or basis for their opinions and conclusions. The weight to be given evidence and the credibility of the witnesses are matters for the Hearing Examiner (now called Administrative Law Judge) to determine.

 The Hearing Examiner has very ably summarized the evidence he considered. A careful review of the record shows that it is a factual and proper summary, supported in every detail by the record. As shown thereby and as further elaborated thereon by this Court, the conclusions of the Hearing Examiner, as affirmed by the Interior Board of Land Appeals, is amply supported by substantial evidence. The appellants (Contestees-Plaintiffs) have not met their burden of establishing that the Board acted arbitrarily nor applied any improper legal standards to the facts. *Sanford v. United States,* 399 F.2d 693, 694 (9th Cir. 1968).

IT IS ORDERED that the motions of defendants for Summary Judgment, are granted; the motion of plaintiffs for Summary Judgment is denied; the decision of the Department of Interior in Arizona Contest # 1069, as affirmed by the Interior Board of Land Appeals No. 72–214, (10 IBLA 56) is affirmed.

IT IS FURTHER ORDERED that judgment herein be entered in favor of defendants and against plaintiffs and that defendants shall recover costs incurred herein.

IT IS FURTHER ORDERED that the Clerk of this Court forthwith mail a copy of this Order to all counsel of record.